[No. H032371. Sixth Dist. Feb. 2, 2009.]

TIN TIN CORPORATION et al., Plaintiffs and Appellants, v. PACIFIC RIM PARK, LLC, Defendant and Appellant.

## Counsel

Judy C. Tsai for Plaintiffs and Appellants.

Kenneth R. Van Vleck, Robert W. Luckinbill and Kathryn C. Curry for Defendant and Appellant.

## Opinion

**ELIA, J.**—In this action for breach of contract and related causes of action, 12 commercial tenants alleged that their landlord, Pacific Rim Park, LLC (PRP), had been unfairly charging them the cost of its LLC (limited liability company) taxes and fees. Plaintiffs further alleged that PRP had failed to provide reasonably detailed annual statements of the expenses they were required to pay under their leases. In a cross-complaint PRP alleged that one of the tenants, Tin Tin Corporation (Tin Tin), had breached its lease by failing to remodel the premises it occupied. After a court trial, neither side recovered, and both appeal. We find merit in plaintiffs' first argument and reverse on that ground alone.

### Background

In November 2000 Steven F. Caserza formed PRP, a limited liability company, expressly to acquire and operate the Pacific Rim Park shopping center. The center was occupied by a number of business tenants anchored by Tin Tin, a grocery store. Each business rented the premises under a lease that differed in some respects from the others, but they all included one term, the "Lessee's Share of Common Area Operating Expenses." These "CAM" expenses (or CAM's) were defined in four of the leases as "all costs incurred by Lessor relating to the ownership and operation of the Project."[1] The other form of lease used for most tenancies was similar, although it referred to the "Industrial/Commercial/office/Shopping Center" rather than the "Project." In

---

[1] The "Project" referred to the premises, the buildings and improvements, and the land they occupied.

each case the definition of "Common Area Operating Expenses" was followed by a list of examples, such as maintenance and improvement costs, utilities, property management and other property services, "Real Property Taxes," and insurance premiums. Each tenant's share of these CAM expenses was based on the proportion of space the tenant occupied relative to the entire premises.

In 2003, 11 of the tenants in the shopping center sued PRP for breach of contract, breach of the covenant of good faith and fair dealing, and fraud. The plaintiffs alleged that PRP had inflated the amounts it had incurred for the CAM's and had failed to provide a reasonably detailed statement showing each tenant's actual share of the CAM charges for the prior year. The parties settled that action, with the tenants to pay a lower amount in accordance with a newer method of calculating the management, accounting, and administrative fees.

On December 9, 2005, 12 tenants commenced the instant action against PRP, asserting breach of contract, fraud, unfair business practices, and related causes of action. Plaintiffs again alleged that the CAM charges were excessive; this time they specifically sought restitution for the LLC fees collected by the Franchise Tax Board for 2001 through 2006, totaling $32,153.92. Plaintiffs further alleged that PRP had failed to provide a reasonably detailed statement showing each tenant's actual share of the CAM's for the preceding year. Plaintiffs requested damages, an accounting, injunctive relief, and a judicial declaration of each party's rights and duties under the leases.

PRP cross-complained for breach of the lease, declaratory relief, and related claims. PRP alleged that Tin Tin had failed to remodel its premises as required by its lease, and that another tenant, All Luck Enterprises, LLC (All Luck), had breached its lease by failing to maintain insurance policies for PRP's benefit. Because plaintiffs' new complaint contained the same claims as in the prior action, PRP further alleged that nine of the plaintiffs had breached the settlement agreement.

The matter was tried by the court in May 2007. Plaintiffs sought to prove that PRP had improperly included as a CAM expense its LLC fees and taxes. They further argued that the annual statement of CAM's did not provide details of the actual expenses incurred, and that PRP had not adequately complied with their requests for more information.

The court granted nonsuit on plaintiffs' causes of action for fraud, breach of fiduciary duty, and accounting. On October 11, 2007, after hearing testimony and considering the parties' posttrial briefs, the court found in PRP's favor on plaintiffs' complaint. The court specifically found that

plaintiffs were properly charged the challenged LLC fees and taxes because those were "costs relating to the ownership and operation of the shopping center within the definition of Common Area Operating Expenses." In the court's view, LLC fees and expenses fell into the category of "Real Property Taxes," a term defined in the leases and included on the list of CAM expenses that could be passed on to the tenants. As to the second claim, the court ruled that plaintiffs had waived their right to a more detailed annual statement. They had received an annual letter in the same format for several years without complaining or asking for more detail; instead, they had only asked for more information. PRP had then provided a "detailed accounting of the CAM charges," and when plaintiffs requested invoices to support the accounting, they received those as well. Thus, the court found, PRP had "substantially complied with the contract requirement" and plaintiffs had demonstrated their "willingness to overlook any lack of detail in the annual letter in favor of access to the source material."

Addressing the cross-complaint, the court found in PRP's favor on the cause of action for declaratory relief, but against PRP on its claims against Tin Tin and All Luck for breach of contract. The court ruled that PRP's allegation that Tin Tin had breached its promise to remodel its premises before March 31, 2000, was barred by the statute of limitations, and the court rejected PRP's assertions of equitable tolling and estoppel. The court further ruled against PRP on its claim that All Luck had failed to maintain insurance, as PRP had suffered no damages as a result of that lapse.

Both sides have appealed. Plaintiffs contend that the leases did not permit the lessor to pass through its LLC fees to its tenants, and they renew their claim that PRP had failed to provide a "reasonably detailed statement" of the CAM charges as required by the leases. PRP challenges the court's ruling that its cross-complaint was barred by the statute of limitations.

### Discussion

#### 1. *LLC Fees and Taxes As Common Area Maintenance Expenses*

On appeal, plaintiffs contend that the court misinterpreted the CAM provisions to allow PRP to charge them with its LLC fees and taxes. These expenses, plaintiffs argue, "are voluntary costs of doing business solely for the personal benefit and protection of the landlord/owner to shield himself from liability . . . and unlike common area operational expenses which are related solely to the repair, maintenance and operation of the land and improvements."

The parties disagree on the standard this court must apply in reviewing plaintiffs' challenge on appeal. PRP insists that to the extent the issues are

even cognizable,[2] review for substantial evidence is the correct standard because conflicting extrinsic evidence was presented on the meaning of the lease term "Common Area Operating Expenses." Plaintiffs maintain that there is no factual dispute on this issue and that we must decide de novo whether LLC fees are CAM expenses. Although plaintiffs advocate independent review in vague terms without citation to relevant authority, their position is the more accurate in the procedural circumstances presented here. The key issue before us is whether the lease term "Common Area Operating Expenses" encompasses LLC fees. The trial court appears to have answered this question primarily, if not exclusively, by resorting to the contract language itself. When the meaning of the contract language may be determined without the aid of extrinsic evidence, we generally apply a de novo standard of review to the construction of the instrument. " ' "Under statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs interpretation. [§ 1636.] Such intent is to be inferred, if possible, solely from the written provisions of the contract. [§ 1639.]" ' " (*ASP Properties Group, L.P. v. Fard, Inc.* (2005) 133 Cal.App.4th 1257, 1269 [35 Cal.Rptr.3d 343], citing the Civ. Code.) "It is therefore solely a judicial function to interpret a written instrument unless the interpretation turns upon the credibility of extrinsic evidence. Accordingly, 'An appellate court is not bound by a construction of the contract based solely upon the terms of the written instrument without the aid of evidence [citations], where there is no conflict in the evidence [citations], or a determination has been made upon incompetent evidence [citation].' " (*Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865 [44 Cal.Rptr. 767, 402 P.2d 839]; see also *City of Hope National Medical Center v. Genentech, Inc.* (2008) 43 Cal.4th 375, 395 [75 Cal.Rptr.3d 333, 181 P.3d 142] [Contract interpretation is solely a judicial function when "based on the words of the instrument alone, when there is no conflict in the extrinsic evidence, or a determination was made based on incompetent evidence"].) To the extent that the testimony adduced by the parties revealed a meaning of which the contract was reasonably susceptible, we defer to the court's determination of those witnesses' credibility and apply the substantial evidence rule to that determination. (See *Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 847–848 [57 Cal.Rptr.3d 363]; *Morey v. Vannucci* (1998) 64 Cal.App.4th 904, 912 [75 Cal.Rptr.2d 573].) Nevertheless, we believe, as the trial court apparently did, that the question of whether the

---

[2] PRP asserts that plaintiffs have forfeited the contentions they raise on appeal because they failed to include the entire reporter's transcript and all the pertinent leases in the appellate record. Although our review is limited to the evidence before us, we decline PRP's invitation to resolve the issues against plaintiffs for failing to include all 12 of the leases in their appendix. PRP's brief itself contains references to portions of the record that do not support its factual assertions.

leases permitted the lessor to pass through these costs to the tenants can be resolved by examining the particular language used by the parties.

In its statement of decision the court stated that the leases at issue were " 'absolute triple-net' leases, allowing the landlord to pass on all costs relating to operation and ownership of the shopping center to the tenants."[3] The trial court's finding that these were *absolute* triple-net leases appears to be based on the opinion of defense expert Randol Mackley, who drew a distinction between triple-net and *absolute* triple-net leases. Having examined "the lease form currently utilized in the shopping center," he testified that this lease was an *absolute* triple-net lease, which "goes beyond" a triple-net lease and requires the tenants to "absorb responsibility for the cost and ownership of the shopping center," including, for example, the roof and structure of the buildings. Absolute triple-net leases, according to Mackley, were far less common in shopping centers than their triple-net counterparts.

 Notwithstanding the witness's characterization, however, "the titles or labels themselves have no legal significance and are not decisive of the extent to which the parties intended to shift the expense burdens of various operating, repair and maintenance obligations from landlord to tenant. Rather, the allocation of cost responsibilities is dictated by the substance of the lease." (Greenwald & Asimow, Cal. Practice Guide: Real Property Transactions, *supra*, ¶ 7:37, p. 7-9 (rev. # 1, 2007), italics omitted.) We will defer to the court's implicit finding that Mackley was credible as to his description and labeling of these leases; but we will independently determine the meaning of the specific terms they contain.

The appellate record contains leases from only four of the plaintiffs, but the trial court found there were essentially two versions among the 12 forms. According to PRP's posttrial brief, four leases followed the version used for Tin Tin's tenancy, while eight used language similar to the lease of Nationwide Real Estate Investments, Inc. (Nationwide).[4] In the Nationwide version, the lessor had the right to charge the tenants with all costs "relating to the

---

[3] A net lease " 'presumes the landlord will receive a fixed rent, without deduction for repairs, taxes, insurance, or any other charges, other than landlords' income taxes. . . . A lease is not "net," as this term is used in long-term leases, if the tenant's repair obligations are less than these.' [Citation.]" (*Brown v. Green* (1994) 8 Cal.4th 812, 827 [35 Cal.Rptr.2d 598, 884 P.2d 55].) Thus, the arrangement involves "the virtually complete transfer of the incidents of ownership from landlord to tenant." (*Hadian v. Schwartz* (1994) 8 Cal.4th 836, 845–846 [35 Cal.Rptr.2d 589, 884 P.2d 46].) "In practice, under a 'net lease,' the tenant may have certain minimal obligations regarding operating costs. Under a 'triple net lease,' all operating costs are the tenant's obligation." (Greenwald & Asimow, Cal. Practice Guide: Real Property Transactions (The Rutter Group 2008) ¶ 7:35, p. 7-9 (rev. # 1, 2007), italics omitted.)

[4] Plaintiffs' appendix contains only the 1999 Tin Tin lease, which is nearly identical to the 2001 lease of All Luck. PRP has provided the All Luck lease in its appendix. PRP also

ownership and operation of the Industrial/Commercial/office/Shopping Center." The four leases like those of Tin Tin and All Luck defined CAM charges as those "relating to the ownership and operation of the Project." The "Project" was specifically defined as "[t]he Premises, the Building, the Common Areas, the land upon which they are located, [and] all other buildings and improvements thereon."

As noted earlier, each lease goes on to list examples of "Common Area Operating Expenses" chargeable to the tenants. All of them relate to the condition of the common areas and improvements: they include utilities, pest control and trash services, and maintenance of the facilities and walkways. The charges also include premiums for rental loss insurance, property insurance (covering "loss or damage to the Premises"), and liability insurance "based upon or arising out of the ownership, use, occupancy or maintenance of the Premises and all areas appurtenant thereto." Thus, all of the enumerated elements of "Common Area Operating Expenses" pertain directly to the physical existence of the shopping center.

■ The court pointed out that PRP was a "single-purpose" entity, "created for the sole purpose of owning and operating the shopping center." Accordingly, all of the LLC taxes and fees were "based solely on income received from the operation of the center." The court's finding that PRP was created for the purpose of owning and operating the center is unassailable. However, the fees and taxes PRP paid *as an LLC* were not dependent on the nature of its function as a property owner, but on the fact that it chose to do business in this state and received revenue from that business. An LLC tax is imposed on an LLC "for the privilege of doing business in this state." (Rev. & Tax. Code, § 17941, subd. (a).)[5] The annual LLC fee, as currently defined, is based on the amount of total income received from all sources "derived from or attributable to this state." (§ 17942.) The former version of the fee statute, the one under consideration here, more generally made the fee applicable to income "from all sources reportable to this state for the taxable year." (Former § 17942, subd. (a).)[6]

Two divisions of the First District recently held that the LLC fee in former section 17942 was in essence a tax, notwithstanding its name. (*Northwest*

included the 1999 leases for plaintiffs Cheng and Nationwide, which were negotiated with PRP's predecessor. In 2004, Cheng's lease was revised to conform to the language of the Tin Tin and All Luck leases.

[5] All further statutory references are to the Revenue and Taxation Code except as otherwise indicated.

[6] The legislative notes accompanying the most recent amendment to the fee statute (§ 17942) indicate that the purpose of the amendment was to offset the loss in state tax revenue caused by the increase in the number of businesses organizing as LLC's rather than corporations.

*Energetic Services, LLC v. Franchise Tax Bd.* (2008) 159 Cal.App.4th 841, 861 [71 Cal.Rptr.3d 642]; accord, *Ventas Finance I, LLC v. Franchise Tax Bd.* (2008) 165 Cal.App.4th 1207, 1221 [81 Cal.Rptr.3d 823].) Plaintiffs' expert testified that the fee paid by LLC's was "tantamount, really, to an income tax on the gross receipts of the LLC." PRP's expert, Dennis Young, testified that an LLC fee is "not an income tax" because "it's a gross receipts fee," but he agreed that "gross receipts" is "another way of saying gross income." Young also described it as a "holding fee paid to the State of California . . . *for the privilege of operating in California* under that entity [*sic*]." (Italics added.) The parties agree that the LLC fee, which is collected by the Franchise Tax Board, is in the nature of a tax.

 We believe the LLC fees and taxes are in essence a cost of conducting business in a particular legal form. As PRP's expert witness acknowledged, an individual owner would not be subject to the LLC fee.[7] Had the entity's business been any other occupation with the same income, it would have been subject to the same assessments. Those assessments were the costs of functioning *as an LLC*, regardless of the type of business that generated the income. That the LLC was "created for the sole purpose of owning and operating the shopping center" does not change the nature of the fee and tax as a cost of maintaining a business entity, nor does it alter the terms of the lease to include such business costs based solely on the entity's choice to engage in this particular business activity. We conclude, therefore, that LLC fees and taxes did not qualify as costs "relating to the ownership and operation" of the Project within the meaning of the contract term "Common Area Operating Expenses." (Cf. *Stony Brook R. R. v. Boston & Maine R. R.* (1927) 260 Mass. 379 [157 N.E. 607, 608–610] [tax on the income of a lessor corporation is not a tax on its property], and cases discussed therein.)

PRP maintains, however, that one of the listed examples of CAM charges, "Real Property Taxes," was phrased broadly enough to encompass LLC fees and taxes. We disagree. Though ineptly drafted, both the heading and the definition of "Real Property Taxes" in each lease appear to refer to assessments based on the nature of the property and the owner's property interest.

The definitions of this element are slightly different between the two versions. The Tin Tin and All Luck leases, for example, provided: "As used herein, the term 'Real Property Taxes' shall include any form of assessment, real estate, general, special, ordinary or extraordinary, or rental levy or tax

---

[7] When asked whether an LLC fee was "a cost of owning the property," Young expressed the opinion that it was "a cost of operation the same as insurance would be a cost of operation or cleaning the parking lot. It's a cost of operating the facility." On cross-examination, however, Young admitted that the fee was not "attached to the facility," since it would not be imposed if it were owned by a private individual.

(other than inheritance, personal income or estate taxes); improvement bond; and/or license fee imposed upon or levied against any legal or equitable interest of Lessor in the Project, Lessor's right to other income therefrom, and/or Lessor's business of leasing, by any authority having the direct or indirect power to tax and where the funds are generated with reference to the Project address and where the proceeds so generated are to be applied by the city, county or other local taxing authority of a jurisdiction within which the Project is located. The term 'Real Property Taxes' shall also include any tax, fee, levy, assessment or charge . . . imposed by reason of events occurring during the term of this Lease, including but not limited to, a change in the ownership of the Project or any portion thereof or a change in the improvements thereon."

This provision is indeed broad, as the trial court observed, but it refers to assessments against *real property* interests, not the privilege of doing business (§ 17941) or the income generated by the conduct of the business (§ 17942). Contrary to PRP's reading, each of the forms of assessment or levy listed in the definition of "Real Property Taxes" does not "stan[d] complete by itself" but is modified by the ending phrase "imposed upon or levied against any legal or equitable interest of Lessor in the Project, Lessor's right to other income therefrom, and/or Lessor's business of leasing, by any authority having the direct or indirect power to tax and where the funds are generated with reference to the Project address and where the proceeds so generated are to be applied by the city, county or other local taxing authority of a jurisdiction within which the Project is located." Thus, it is not just "any" tax or assessment that meets the definition, as PRP argues. Read as a whole, the definition of "Real Property Taxes" appears to refer to payments directly applicable to the property itself, not to the form in which the lessor has chosen to operate its business.[8]

PRP further reads the provision to encompass LLC fees and taxes because they are "generated with reference to the [Project] address"—that is, they are "dependent upon and calculated based on the income derived from the shopping center, which is located in California." In our view, the source of the income is relevant only in determining whether the LLC is subject to the section 17942 fee and how much is owed each year. Like the section 17941 tax, the fee is imposed because the taxpayer is an LLC, not because it owns real property.

The 1999 leases of Nationwide and Cheng were representative of those using a slightly different definition of "Real Property Taxes": "10.2 Real

---

[8] We express no opinion regarding the significance of the phrase "where the proceeds so generated are to be applied by the city, county or other local taxing authority," because there are no facts in the record indicating how the proceeds of the LLC fees and taxes are applied after being collected by the state.

Property Tax Definition. As used herein, the term 'Real Property Taxes' shall include any form of real estate tax or assessment, general, special, ordinary or extraordinary, and any license fee, commercial rental tax, improvement bond or bonds, levy or tax (other than inheritance, personal income or estate taxes) imposed upon the Industrial Center by any authority having the direct or indirect power to tax, including any city, state or federal government, or any school, agricultural, sanitary, fire, street, drainage, or other improvement district thereof, levied against any legal or equitable interest of Lessor in the Industrial Center or any portion thereof, Lessor's right to rent or other income therefrom, and/or Lessor's business of leasing the Premises. The term 'Real Property Taxes' shall also include any tax, fee, levy, assessment or charge, or any increase therein, imposed by reason of events occurring . . . during the term of this Lease . . . ."

Again PRP rests its position on an incomplete reading of the provision. The contract does not define the term "simply" as *any* form of levy or tax without qualification; it must be (a) a *real estate* tax or assessment or (b) a license fee, tax, or other assessment—in either case, one that is imposed *upon the industrial center* and subject to other qualifying conditions.[9] The language beginning with "levied against any legal or equitable interest of Lessor in the Industrial Center" does not have a clear antecedent. The most reasonable reading of this disjointed clause inserts no words, thus referring back to both the "real estate tax or assessment" *and* the license fee and other taxes. Thus, *all* of the assessments covered by the provision must be those that are "levied against any legal or equitable interest of Lessor in the Industrial Center or any portion thereof, Lessor's right to rent or other income therefrom, and/or Lessor's business of leasing the Premises." If the unattached clause was intended instead to refer to a fee, levy, or tax that is "imposed upon the Industrial Center," it lacks a conjunction that would make the sentence complete and coherent.[10] In any interpretation of the ambiguous sentence, however, the contemplated assessments are those directly connected to the lessor's property interest. That an LLC incidentally is involved in the business of leasing property does not make the fees and taxes it pays real estate taxes.

---

[9] Even if "imposed upon the Industrial Center" refers exclusively to the "license fee, tax, or other assessment," it makes no difference for purposes of determining whether the assessments are directly related to the property, because the other obligation is expressed as a *real estate* tax or assessment.

[10] The later leases of Tin Tin and All Luck appear to have alleviated some of the vagueness of the Nationwide version by moving the unattached participial phrase "levied against" to a position immediately after "imposed upon" so that the listed types of assessment anticipate "any legal or equitable interest of Lessor in the project, Lessor's right to other income therefrom, and/or Lessor's business of leasing."

We thus conclude that the leases in the record before us contemplate a more direct connection to the property than is represented by the form of the business entity that owns the property. While we agree with the trial court's statement that plaintiffs agreed to bear the costs of ownership of the property, LLC taxes and fees are not the costs of owning property but the costs of operating a business in a form that limits the personal liability of its principal.

## 2. *Reasonably Detailed Statement*

Each lease required the lessor to provide a "reasonably detailed statement" of the tenant's share of CAM expenses incurred during the preceding year. In the first cause of action of their complaint, plaintiffs alleged that PRP had breached that contractual obligation for 2001 through 2005, by providing only a one-page letter summarizing the expenses without sufficient information to enable the tenants to reconcile the charges with their payments. The trial court found that plaintiffs had waived their right to a more detailed statement by accepting the one-page letter for several years without asking for a more comprehensive statement. Instead, the tenants had asked PRP for more information about the expenses. PRP had then provided a detailed accounting of the charges and, when requested, invoices to support the accounting. Thus, the court found, PRP had "substantially complied with the contract requirement. Given the tenants' willingness to overlook any lack of detail in the annual letter in favor of access to the source material, plaintiffs cannot now complain that the notices they received were inadequate."

On appeal, plaintiffs contend that the court abused its discretion in making this ruling, because they had in fact objected that the letter contained insufficient detail, through their repeated requests for documentation to remedy the deficiency. As PRP points out, this issue involved questions of fact that we review for substantial evidence.[11] (*Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 983 [64 Cal.Rptr.2d 843, 938 P.2d 903]; *Long Beach Unified Sch. Dist. v. State of California* (1990) 225 Cal.App.3d 155, 170–171 [275 Cal.Rptr. 449].)

Plaintiffs have pointed to testimony at trial regarding the tenants' uncertainty over the actual CAM amounts spent and their requests for further information. The respondent's appendix also contains e-mail correspondence in which requests were made for this information. However, even if this evidence did not support the court's finding of waiver, we note that the court's second finding is unchallenged. Plaintiffs do not contest the court's

---

[11] We will not consider evidence for the years covered by the 2003 lawsuit. Plaintiffs raised this issue and had an opportunity to set forth any resolution in the ensuing settlement. Consequently, for 2001 and 2002, the period litigated in the prior action, the issue is res judicata.

determination that the additional information provided on each occasion through the accounting and its supporting invoices was sufficient to address the tenants' concerns and thus comply with the contract requirement. Plaintiffs' failure to object to the additional information suggests that PRP adequately complied with their request and thus either satisfied the contract term or cured any initial deficiency in compliance. As we are not offered any argument to the contrary, the lower court's finding is upheld.

### 3. PRP's Cross-appeal: Tin Tin's Promise to Remodel

The July 1999 lease between Tin Tin and the original lessor required Tin Tin to remodel its premises beginning no later than September 15, 1999, and complete the work no later than March 31, 2000. Failure to adhere to these dates would constitute a default "unless (a) the delay has been approved by Lessor in writing, or (b) the delay was for causes beyond the reasonable control of Lessee . . . provided Lessee has given Lessor written notice of such delay(s) within ten (10) days of the occurrence of the event causing such delay(s)."

As of March 31, 2000, however, the work was not yet underway. On September 20, 2002, Steven F. Caserza, manager of PRP, sent a letter reminding Tin Tin of the contract provision and asserting that Tin Tin "continue[d] to be in breach" of the lease for failing to complete the improvements by the contract deadline. Referring to Michael Lim, the store manager, Caserza added, "Michael has indicated to me that you plan to do the improvements in 2003. Therefore, please provide us with the following, as required by your lease . . . ." Caserza then requested nine documents pertinent to the contemplated work, including preliminary plans, permits and permit applications, and construction contracts. For any information that was not yet available, Caserza demanded copies of current drafts "and an explanation of the current status of that specific item." Caserza concluded, "Although you might not yet have established a start date for this work, providing us with the above information as soon as possible will be a very important consideration to your lease status."

Caserza received only one of the requested documents, the preliminary plans and specifications. He testified that he took no action after this letter to "ensure that the remodel would be done" because he was relying on Lim's assurances that it would be conducted in 2003.[12] In 2003 Caserza learned that

---

[12] One of Tin Tin's employees testified that Lim was not authorized to make decisions about a remodel. The assistant vice-president, however, said that Lim had helped with some of the coordination of the remodel.

Lim had left the store and that Tin Tin was looking for a new manager. When no new store manager appeared, Caserza abandoned his intention of talking to someone about the situation and brought suit.

In PRP's posttrial brief it asserted that its cross-complaint was timely because Caserza had extended the date for performance in his September 20, 2002 letter. PRP argued that it had until January 1, 2008, to bring suit, based on the amended completion date of December 31, 2003. PRP alternatively contended that the doctrine of equitable tolling moved the expiration date of the statute of limitations 35 months past March 31, 2004, to the end of February 2007, because Lim had continued promising Caserza through the end of 2003 that the remodel would still occur. Finally, PRP argued that Tin Tin was equitably estopped from asserting the statute of limitations as a defense because Caserza had granted extensions to Tin Tin in reliance on Lim's misleading assurances that the remodel was going forward.

The trial court ruled that PRP's cross-complaint was untimely because PRP took no action before March 31, 2004, to obtain a legal remedy for Tin Tin's breach. The September 2002 letter did not extend the time for performance, the court explained, nor did Caserza offer to forbear to take legal action for Tin Tin's breach. The court further rejected PRP's assertions of equitable tolling and equitable estoppel, because PRP was aware that Tin Tin had not even begun the remodel before the end of 2003 and Tin Tin "did nothing thereafter to dissuade PRP from filing suit to enforce the lease."

█ It is undisputed that the statute of limitations for breach of contract is four years (Code Civ. Proc., § 337), and that PRP filed its cross-complaint on December 9, 2005, more than four years after the contract completion date of March 31, 2000. PRP does not renew its prior claims of estoppel or equitable tolling; its only contention on appeal is that Caserza gave Tin Tin written approval of an extension of the performance date to 2003, thereby delaying the onset of the four-year statutory period for contract actions. Tin Tin's response—that it had not agreed to any modification of the lease to authorize a new completion date—is not helpful.[13] It is nonetheless clear that Tin Tin made no effort even to begin the work at any time in 2003, and that PRP was aware of that fact.

---

[13] Tin Tin points out that section 46 of the lease requires any modification to be "in writing, signed by the Parties in interest at the time of the modification." The parties litigated the matter under the more specific remodeling provision, however, and the trial court addressed the effect of the 2002 letter under that section rather than section 46. In any event, we cannot endorse what amounts to a suggestion that PRP did not waive Tin Tin's breach because Tin Tin did not *agree* to be relieved of its contractual duty.

PRP incorrectly asserts that the relevant facts were not in dispute and that we therefore must review the lower court's ruling as a matter of law. On the contrary, the intent of the September 20, 2002 letter was a disputed issue that turned on trial testimony as well as the writing itself. Accordingly, we will apply the substantial evidence rule in reviewing the determination that Caserza's letter was not intended to be a written approval of Tin Tin's delay in performance.

Notwithstanding the incompleteness of the appellate record, there is sufficient evidence to support the trial court's ruling. It was not contested that Tin Tin was already in breach at the time Caserza wrote the letter, as performance had been due by March 31, 2000, almost two and a half years earlier. The import of PRP's letter was to remind Tin Tin that it "continue[d] to be in breach." At best Caserza indicated that PRP would *consider* accepting Tin Tin's performance in 2003 *if* the plans, cost estimates, and permits PRP had demanded were satisfactory. Caserza did not, however, retract his assertion that Tin Tin was in breach, nor did he promise to refrain from filing suit if Tin Tin completed the work by the end of 2003. PRP clearly left itself the option of suing for breach of the existing lease at any time, even if Tin Tin provided the requested information.

We thus find no error in the trial court's determination that the September 20, 2002 letter was insufficient to constitute retroactive written approval of a new performance date. Even if PRP implicitly agreed to overlook the existing breach as long as performance was completed in 2003, this decision did not mean PRP could sit on its rights for two more years and then unilaterally claim the benefit of an extended limitations period. It would not be reasonable for a landlord to assume that it could delay the onset of the statute of limitations indefinitely merely by agreeing to wait for the tenant to perform the tenant's contractual obligation.

PRP does not alternatively claim that the statute began running on March 31, 2000, and was tolled on September 20, 2002; such an argument would not succeed, as the four-year period would have been extended for only 15 months 11 days. Thus, PRP's December 2005 suit would still have been untimely. When December 31, 2003, arrived without any steps by Tin Tin to begin the remodel, PRP should have exercised its right to file suit for breach of contract by March 31, 2004. The trial court properly concluded that while a cause of action for breach of contract did accrue against Tin Tin, PRP failed to act promptly to seek redress for the breach.

## Disposition

The judgment is reversed. The matter is remanded for the limited purpose of redetermining the CAM expenses properly chargeable to plaintiffs under their leases, exclusive of LLC taxes and fees. The trial court shall enter a new judgment in accordance with its findings on that issue and consistent with its prior determination of the remaining issues. The parties shall bear their own costs on appeal.

Rushing, P. J., and Premo, J., concurred.