Filed  03/30/26

VERMONT SUPERIOR COURT

Washington Unit
65 State Street
Montpelier VT  05602
802-828-2091
www.vermontjudiciary.org



CIVIL DIVISION

Case No. 23-CV-01881

| Malone 118 Main Street Montpelier Properties, LLC v. Hugo's Restaurant Group, LLC et al |
| --- |

## ENTRY REGARDING MOTION

Title:          Motion for Summary Judgment - Partial (Motion: 7)
Filer:          Christopher J. Smart
Filed Date:   July 10, 2025

The motion is GRANTED.

This decision concerns the method of allocating utility expenses between two parties to a commercial lease.  Defendant tenants, Hugo Restaurant Group, LLC and Thomas Greene, contend that the plain language of the lease puts the payment of all utilities within the monthly CAM charges, subject to an annual reckoning where the expenses could be trued up with the actual costs.  Plaintiff landlord, Malone 118 Main Street Montpelier Properties, LLC, disagrees and contends that Tenants were obligated to pay any and all utilities themselves for the rented spaces, outside of the CAM charges.

Tenants have moved for partial summary judgment contending that the plain language of the parties' lease controls on this issue.  Landlord opposes this motion and contends that there is ambiguity in the agreement due to the context and circumstances, including the Letter of Intent and subjective understanding of Landlord's principal.  After reviewing the pleadings, the Court finds that the Defendant's position is supported by the unambiguous plain language of the lease agreement, and they are entitled to partial summary judgment on this issue.

### Background Facts

The key facts to the present decision are largely uncontested.  Landlord owns a commercial property located at 118 Main Street in Montpelier, Vermont that has historically housed various restaurant businesses.  In August 2021, Defendants and Landlord began

1

negotiating a lease agreement.[1]  Defendants were seeking to open a new restaurant in the 118 Main Street property, which at the time had become vacant.  Plaintiff was looking to rent the commercial space to a business.  In November 2021, the parties finalized and executed a commercial lease, which Defendants have submitted as Exhibit A to their motion.  Plaintiff does not dispute that this is a true and accurate copy of their final agreement.  There is no dispute that the Exhibit A Lease was the governing document when the commercial relationship began and Defendants started occupancy of the property in 2022.[2]

The Exhibit A Lease is comprised of 9 pages.  The first four contain 22 sections, laying out the terms and conditions of the parties' agreement.  Pages five through seven contain signatures and guarantees.  The last two pages contain drawings and plans for demolition and renovation of the property allocating work and costs between Landlord and Tenant.

The term of the Lease ran for five years, from March 1, 2022 to February 2027.  Tenants agreed to pay a minimum annual rent of $66,000 in monthly installments, subject to 2.5% annual increases over the life of the tenancy.  The premises are described as the first and second floors and basement of the 118 Main Street property consisting of 7,780 +/- sq. ft.[3]

Under Section 5, the Lease lays out the "Operating Costs and CAM."  CAM costs stands for "Common Area Maintenance" costs.  That term is defined in Section 5(d) to "include, but not be limited to, property taxes assessed on the Premises, insurance premiums, total costs for operating, repairing, lighting, cleaning, maintaining, painting, securing and managing the Premises and other costs generally associated with common area maintenance together with an administrative fee equal to (5%) five percent of the total CAM costs."  Ex. A (Lease) at § 5(d).

---

[1] Plaintiff has included a copy of the unsigned letter of intent that it generated at the outset of negotiations.  It is unclear from the record before the Court if this letter was signed, but there is evidence that the parties used the document as a launching pad for their negotiations.

[2] The record indicates that this occupancy began after the parties made substantial investments and renovations to the commercial space.

[3] The lease establishes the square footage of the premises at 118 Main Street as 16,705 square feet and the leased portion of the premises as 7,780 square feet, or 46.6% of the total premises.  Exhibit A at § 5(b).  While the Court understands there is some dispute about the exact square footage leased, the material fact for the purpose of the present motion is the fact that Defendants were only leasing a commercial space within the premises that represented a portion of the total premises.

In Section 12, the Lease enumerates additional obligations of the Tenants. It includes Section 12(b), which states that the Tenants "will pay for its own electricity, district heat, propane supplied heat, and water and sewer charges to be billed through CAM based on Tenant's proportionate share." *Id*. at § 12(b). The Lease does not mention utilities anywhere else in the Lease. There is no language requiring tenants to put any utilities in their own name or take control of any particular accounts associated with these services. There is no suggestion that Defendants as Tenants would be obligated or even authorized to take such actions.

The overall language of the lease demonstrates that the parties intended something close to a triple net lease. *Brenner v. Amerisure Mutual Ins. Co.*, 893 N.W.2d 193, 195 n.1 (Wisc. 2017) (describing the characteristics of a triple net lease). In a "triple net lease," the tenant typically pays a monthly lump sum rent and is also responsible for maintenance, insurance, real estate taxes, and utilities. *Id*.[4] In this case, the parties agreed that Plaintiff would receive a regular, fixed monthly payment of rent that would only increase 2.5% each year over the life of the lease.

Looking to the other terms of the Lease, the Court finds that the language assigns other costs associated with the premises in different permutations. For example, the insurance provisions of Section 8 require each party to obtain and maintain their own insurance policies. *Id*. at § 8. Plaintiff was required to obtain a premise liability policy, and Defendants were required to obtain a personal property/fixture replacement policy and a general liability policy of up to two million dollars.[5] Only Defendants were required to make Plaintiff a co-insured on their policies.

---

[4] In some states, real estate developers appear to distinguish between "triple net leases" where the expenses are paid either directly or indirectly by the tenant and "absolute triple net leases" where tenants are expected to absorb all "costs and expenses" including structural repairs whether they are itemized in the lease or not. See *Tin Tin Corp. v. Pacific Rim Park, LLC*, 88 Cal.Rptr.3d 816, 821–22 (Cal. App. 2009). Courts have generally not recognized this as a fixed distinction but have looked to the plain language of the lease to interpret the parties' obligations. *Id.* at 822.

[5] The language of this section seems to indicate that each party would be responsible for obtaining and maintaining the policies and would be required from time-to-time to show proof to the other, but Section 5(d) includes provisions for insurance premiums to be paid through CAM charges. Given that Defendants were not required to be named as co-insureds on Plaintiff's premise policy, it is unclear from the language of the lease how the parties intended to divvy the costs of the various policies, whether the parties intended Defendants to pay for all three policies, or if the insurance premium provision in Section 5(d) was merely an example of the type of costs that Plaintiff would pass along to Defendants.

The lease's CAM costs, which as noted above, include provisions for insurance premiums, property taxes, operation and maintenance costs, and other costs generally associated with common area maintenance, requires Defendants to (1) pay a fixed monthly CAM cost; (2) allow that number to be adjusted periodically; and (3) periodically, no less than once a year, pay a difference that arose between the CAM costs and Plaintiff's actual expenses. *Id.* at § 5(c) and (d). In doing this, the language is consistent with assigning all costs to the Defendants, but it keeps control of the expenses and their initial payments with Plaintiff.

In other words, Plaintiff remained responsible for paying the property taxes at 118 Main Street, but there was an expectation that Defendants would, through the CAM costs, reimburse those expenses to the extent that they concerned Defendant's square footage of rental property and a percentage of the common areas. *Id.* Further, the CAM charges are not based on a common area or a percentage of use of the common area, but they are calculated based on the square footage of the premises being leased at a rate of $2.00 per square foot to be paid on a monthly basis.[6]

Beyond these provisions, there are sections of the lease that required Defendants to do some of their own repairs and maintenance while reserving other provisions for Plaintiff to perform, particularly in regard to any HVAC or structural repairs. Exhibit A at §§ 12, 13. The heart of the parties' dispute, at least for purposes of this motion, concerns how to interpret Section 12(b) concerning the electricity, district heat, propane, and water and sewer charges relating to the 46.6% of the premises leased to and controlled by the Defendants. In this dispute, the Court detects no question as to whether Defendants were responsible for these costs. The provisions of the lease assign these expenses to Defendants, and such an interpretation is consistent with general triple net provisions in the lease. The parties' dispute lies with the question of whether Section 12(b) required Defendants to pay those expenses directly to the providers, or if they were intended to be folded into the CAM costs.

Looking at the actual clause, it behooves the analysis to reprint the language in full:

[T]he Tenant covenants and agrees:

*      *      *

_____

[6] The CAM costs provisions also permit Plaintiff to charge a 5% administrative fee on any costs incurred as CAM charges.

4

b. That it will pay for its own electricity, district heat, propane supplied heat, and water and sewer charges to be billed through CAM based on Tenant's proportionate share.

Exhibit A, at § 12(b). The dispute centers on the adverbial phrase "to be billed through CAM based on Tenant's proportionate share" found at the end of the sentence. Defendant contends that this adverbial phrase is intended to modify the entire sentence and all of its provisions. Plaintiff disagrees and contends that it is only intended to modify the last item, water and sewer charges. Plaintiff argues that the original version of the lease before the parties completed their edits and modifications along with Plaintiff's original Letter indicate a different intent by Landlord and create, at a minimum, an issue of ambiguity that can only be resolved through the weighing and sifting of this evidence, which is inappropriate for summary judgment.

**Legal Analysis**

A. *Standard of Review*

Vermont Rule of Civil Procedure 56 governs motions for summary judgment. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to as a matter of law." V.R.C.P. 56(a); see *Gross v. Turner*, 2018 VT 80, ¶ 8, 208 Vt. 112; *Gilman v. Maine Mut. Fire Ins. Co.*, 2003 VT 55, ¶ 7, 175 Vt. 554. The moving party must support its assertion with numbered paragraphs with references to materials in the record. V.R.C.P. 56(c)(1). The nonmoving party must show that the material facts are in dispute. *Boyd v. State*, 2022 VT 12, 275 A.3d 155. The nonmoving party does this through introducing their own admissible evidence. *Gross*, 2018 VT at ¶ 8. Additionally, the court gives the nonmoving party the benefit of reasonable doubts and inferences. *Brousseau v. Brousseau*, 2007 VT 77, ¶ 5, 182 Vt. 533. If the court determines there are no genuine issues of material fact, and the movant is entitled to judgment as a matter of law, the court will grant summary judgment. V.R.C.P. 56(a).

The interpretation of a contract is a question of law. *Progressive Northern Ins. Co. v. Muller*, 2020 VT 76, ¶ 11. The purpose of contract interpretation is to implement the parties' intent at the time the contract was formed. *Dep't of Corrections v. Matrix Health Systems, P.C.*, 2008 VT 32, ¶ 12. When the language of the contract is clear on its face from the plain language of the contract, then the Court will assume that the intent of the parties is embedded within its

terms. *Id*. If the writing can support different interpretations, which appear "when it is read in light of the surrounding circumstances, and both interpretations are reasonable," then there is an ambiguity, and the Court then must look to evidence outside of the agreement, including testimony from the parties, to resolve. *Id.* (quoting *Isbrandtsen v. N. Branch Corp.*, 150 Vt. 575, 579 (1988)). If the meaning of a contract is ambiguous, then interpretation becomes a mixed question of fact and law, and summary judgment may not be appropriate. *Cate v. City of Burlington*, 2013 VT 64, ¶ 15.

B. *The Interpretation of Section 12(b)*

The central question for the present motion may be broken into two parts. First, how should the Court interpret the adverbial phrase in Section 12(b)? Does it modify the series of expenses listed or simply the last item? Second, if the Court interprets the adverbial phrase to modify the series in the whole sentence, do the circumstances suggest a latent ambiguity?

1. *The Plain Language Syntax under the Serial Qualifier Rule*

As to the first question, the Court is guided by the parallel construction of the sentence and consistency of all nouns and verbs. As Justice Scalia and Professor Garner have instructed: "When," in a contract or statute, "there is a straightforward, parallel construction that involves all nouns or verbs in a series," a modifier following the last item in the list "normally applies to the entire series." Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 147 (2012) (quoted in *United States for Use and Benefit of Central Southern Construction Corp. v. Gulf Building*, 568 F.Supp.3d 1395, 1399 (S.D. Ga 2021). This rule of construction is known as a "series qualifier." *United States v. Lockhart*, 749 F.3d 148, 152 (2d Cir. 2014), aff'd, 577 U.S. 347 (2016). While the series qualifier rule is neither fixed, nor mandatory, its reasoning is largely consistent with the language of the sentence and the context of the agreement for six reasons.

**First**, the adverbial phrase at issue ("to be billed through CAM based on Tenant's proportionate share") does not modify the proceeding noun, but it modifies the verb "to pay." The sentence commands Defendants "to pay" and then lists the four types of utilities that they have to pay. The adverbial clause modifies the verb by specifying how these expenses are to be paid. This modification, by virtue of the sentence structure, then applies to all four categories without distinction. Applying it to some of the nouns in the sentence, but not others, would be inconsistent with the syntax.

6

**Second**, the nature of the listed items in Section 12(b) are parallel in construction. They are all utilities billed by third parties that would be directly attributable to the Defendants as tenants and their use of the space. Electricity, heat, propane, and water and sewer, while different utilities, are all, functionally, the same. They are delivered, usually automatically, to the property; they are used at a rate that is dependent on the intensity of use; and their costs are periodically invoiced. All four utilities are essential not only to the tenant but to maintaining the premises. Failure to maintain heat or electricity could lead to freezing pipes and damage to the structure.[7] Lack of water and sewer renders the premises uninhabitable. They are effectively the same necessary third-party services in which both landlord and tenant have a strong interest in ensuring that they are paid on a regular and continuing basis.

**Third**, there is no question, at least as the present motion is framed, that Defendants were responsible for all of the utility costs attributable to their rental space. The sole question is whether payments were intended to flow through Plaintiff's CAM costs or directly to the supplier. Section 12(b) is the only part of the lease that addresses these utility expenses, and the only instruction as to how these expenses were to be paid is found in the final part of the sentence—the adverbial phrase assigns payment through CAM costs. There is no express language in Section 12(b) that the first three utilities are to be paid directly to the suppliers. Plaintiff's argument, to this extent, would require the Court to infer that term out of necessity through the exclusion of the adverbial phrase. Such an interpretation is disfavored because it would substitute an implied term for an express one. See *Sutton v. Purzycki*, 2022 VT 56, ¶ 37 ("A contract 'must be interpreted according to the parties' intent as expressed in the writing.'") (quoting *Lussier v. Lussier*, 174 Vt. 454, 455 (2002) (mem.)).

**Fourth**, there is the general silence of the contract as to Defendants setting up their own accounts. Unlike the insurance provision of Section 8, there is no language instructing Defendants to establish their own accounts with the electrical supplier, the City (for water, sewer, and district heat), or a propane supplier.

**Fifth**, the contract itself envisions an active, on-premises landlord. Plaintiff retained a majority of the premise's square footage and assigned itself responsibility for maintaining the

---

[7] Section 12(n) of the lease expressly requires Defendants to "maintain sufficient heat in the premises to insure that no damage shall occur to the plumbing systems or generally to the premises as a result of freezing or other exposures to cold." Exhibit A, at § 12(n).

HVAC systems, the structural components of the premises, and the common areas. In fact, the Lease obligations begin the relationship by assigning Plaintiff to undertake several modifications to the space and perform work subsidized by Defendants. Unlike some leases where the tenant simply takes full control of the premises and becomes wholly responsible for the premises, the agreement here portrays something closer to an on-going, day-to-day relationship. Within such a relationship, it would not be unreasonable for Plaintiff, who was acting as property manager, to keep the utility accounts under its control and to bill Defendants accordingly.[8] In this respect, reading Section 12(b) in the manner championed by Defendants is consistent with nature of the parties' Lease relationship, particularly Plaintiff's role, as a *de facto* property manager.

**Sixth**, the alternative to the serial qualifier rule is not generally supported by the context of Section 12(b). Against the serial qualifier rule, there is a contradictory provision known as the "last antecedent rule," which states that "a limiting clause or phrase . . . should ordinarily be read as modifying only the noun or phrase that it immediately follows." *Barnhart v. Thomas*, 540 U.S. 20, 26 (2003); see also *Lockhart*, 577 U.S. at 351; *City of St. Petersburg v. Nasworthy*, 751 So.2d 772, 774 (Fla. App. 2000) (collecting cases). Courts generally apply the last antecedent rule when applying the modifier would render the prior provisions nonsensical. Justice Alito cites to several examples in his concurrence in *Facebook, Inc. v. Duguid*, 592 U.S. 395, 411 (2021).[9]

As many of these cases explain, the choice between applying the serial qualifier and the last antecedent rules rests upon context. See, e.g., *United States for Use and Benefit of Central Southern Construction Corp.*, 568 F.Supp.3d at 1400. As Judge Wood notes:

---

[8] Not to mention the benefit of being able to add the 5% administration fee to such amounts.

[9] These example sentences include:

> "At the Super Bowl party, she ate, drank, and cheered raucously."
> "On Saturday, he relaxes and exercises vigorously."
> "When his owner comes home, the dog wags his tail and barks loudly."
> "It is illegal to hunt rhinos and giraffes with necks longer than three feet."
> "She likes to swim and run wearing track spikes."

*Id*. Note that each sentence in this list is comprised of different actions (verbs) that the adverbial phrase would have to modify if applied. In such cases, it makes sense that the adverbial phrase would not uniformly apply and would generate absurdities (such as "to swim wearing track spikes"). It is more difficult to imagine a sentence with a single verb and series of direct objects for which this contrast would yield the same absurd or striking results.

8

> Simply put: context is king. At bottom, "[w]hether a modifier is 'applicable as much to the first as to the last' words in a list, whether a set of items form a 'single, integrated list,' and whether the application of the rule would require acceptance of an 'unlikely premise' are [all] fundamentally contextual questions." *Lockhart*, 577 U.S. at 355-56, 136 S.Ct. 958. As Justice Alito put it in his *Facebook* concurrence: whether a modifier applies to an entire list or just the nearest antecedent sometimes "has little to do with syntax[,] and everything to do with our common understanding" of what words likely mean in a given context. *Facebook*, 141 S.Ct. at 1174; see also *id*. ("[w]e can see [the result change] if we retain the same syntax but replace [one of the list items] ... with any number of other [words] that describe something" the modifier is unlikely to modify).

*Id*. In this case, the context drawn from the plain language does not support applying the last antecedent rule, nor does the syntax, grammatical structure, or even sense of the sentence support its application. As noted above, the application of the adverbial phrase to the first three utilities does nothing to the sense of the sentence, but it does not create a more coherent interpretation that would recommend applying the last antecedent rule over the serial qualifier rule.

For these reasons, the Court finds that the plain and reasonable reading of Section 12(b) requires the application of the adverbial phrase to the sentence to a whole, and that interpretation is imbedded in the plain language of the sentence.

### 2. A Brief Analysis of the Circumstances

Plaintiff argues that the Court must look beyond the plain language of the Lease to the circumstances of its formation to see that the resulting interpretation that all utility charges would be addressed through the CAM costs is ambiguous. Plaintiff cites the Vermont Supreme Court's decision in *Isbrandtsen v. N. Branch Corp.* and its progeny for the principle that even if the language of the agreement appears unambiguous, the Court may look at circumstances surrounding contract formation that would demonstrate ambiguity. *Isbrandtsen*, 150 Vt. at 578–79.

As a preliminary issue, this investigation into the circumstances is only supported when the agreement could support a different interpretation. *Id*. at 579. As indicated above, the Court does not find the Plaintiff's interpretation of Section 12(b) to be supported by the syntax or plain meaning of the phrase. Nevertheless, the Court has reviewed the circumstances proffered by Plaintiff as there is some question as to whether the Court's syntax and interpretation analysis automatically shuts down an analysis of circumstances, or if the circumstances should always be considered to highlight a substantive ambiguity belied by a facial consistency. *See id*. 579–80

(describing the interwoven process of contract interpretation between plain language, circumstances, and canons of construction). Given that the Court has relied, in part, on a canon of construction to explain its analysis, it would be remiss if it abdicated further circumstance-based analysis.

To that end, Plaintiff's primary argument relies upon the initial contract formation documents and correspondence. These documents show: (1) that Plaintiff's initial offer contained language that made the utilities Defendants' responsibility; (2) that the initial draft of the contract did not contain the adverbial phrase directing payment through the CAM cost provisions; and (3) correspondence from Defendants that indicate general agreement with the provisions as proposed and the addition of the phrase during the contract editing process. The inference that Plaintiff seeks from these facts is to show that it was not the intent of the parties to run the utilities through the CAM cost process but rather that the language evolved from what might be colloquially classed as sloppy drafting, where one limited modification changed the meaning of the entire clause.

In response, Defendants bring forward the fact that the utilities at the time of contract formation were run through a single meter. Plaintiff objects to this fact on technical grounds, but the primary objection is that the utilities were either capable of being separately metered as installed (electricity) or could have been passed along to the Defendants (district heat).

The Court does not find any of the circumstances compelling or requiring a different interpretation of Section 12(b). Plaintiff's arguments, at best, demonstrate that the parties could have allocated the expenses in a different manner than Section 12(b) reads. The Lease could have required Defendants to put electric in its own name and specified that Plaintiff would pay the City of Montpelier directly for any district heat expenses. But the Lease does not say any of this. In fact, a similar argument could be made about the allocation of property taxes in the CAM costs. In this respect, mere possibility does not make probability.

Whether fully intended or not, the parties, both sophisticated business actors with the assistance of counsel, amended the earlier drafts of the Lease to modify how utilities would be paid. While Plaintiff now claims that it did not intend this interpretation, the circumstances only support a finding of unilateral mistake, and they do not support the type of mutual mistake that would require a retroactive interpretation obligating Defendants from day-one of the Lease to

10

pay the utility providers directly.  *Town of Lyndon v. Burnett's Contracting Co., Inc.*, 138 Vt. 102, 107 (1980).[10]

In coming to this conclusion, the Court relies on the following.

**First**, the preliminary discussions and drafts focus on Defendants being responsible for the utility costs.  There is less detail on how payments would be made—either directly to the providers or through Plaintiff.  The discussions and negotiations do not go into such detail.  As the Court has found, under either interpretation of Section 12(b), Defendants were responsible for the utilities.  In this respect, there is nothing inconsistent or latently ambiguous in having payment go through the CAM costs, rather than direct payments.

**Second**, Plaintiff cites certain inconsistent statements made by Defendant Thomas Greene in his deposition, but the more telling circumstance in this respect is how Defendants behaved at the start of the lease.  The depositions indicate that Defendants did not move to put any utilities in their name at the start of the lease, in contrast to the other actions that Defendants took to fulfill their lease obligations.

**Third**, by Plaintiff's own admission, the assignment of these utilities to Defendants would not have been uniform or consistent along Plaintiff's preferred interpretive lines.  For example, there is some evidence to suggest that the Defendants could have put the electricity into their name with little or no adjustment necessary.  The district heat, however, like the water and sewer, could not have been put in Defendants' name.  Plaintiff's contention that it could have provided those invoices to Defendants and had Defendants make the payments directly to the City does not cure this problem.  In fact, it further complicates Plaintiff's preferred interpretation to effectively require a third implied payment method between the CAM costs process of Section 5 and creating an independent account.  Again, while such methods are reasonable and could have been required, the plain language and meaning of Section 12(b) does not support this interpretation that Defendants were expected to pay utilities through multiple payment methods, despite the fact that there is only one verb "to pay" and one adverbial phrase modifying that verb.

For these reasons, the Court finds no latent ambiguity or support for Plaintiff's interpretation in the circumstances of formation.

---

[10] As noted in *Town of Lyndon*, a unilateral mistake does not preclude recission, but where the mistake arises from one party's negligence or inattention and the other party is without contributing fault, then such relief is not granted "absent unusual circumstance" that would invoke injustice.  *Id.*

## **ORDER**

Given the Court's analysis that Section 12(b) required Defendants to pay for the electricity, district heat, propane, and water and sewer through the CAM costs process laid out in Section 5 of the lease, Defendant's Motion for Partial Summary Judgment is **Granted.** Due to the lengthy briefing process on this issue, the Court will set this matter for a status conference to assess the parties' readiness for trial, including completion of discovery and mediation requirements.

Electronically signed on 3/30/2026 10:41 AM pursuant to V.R.E.F. 9(d)

_____

Daniel Richardson
Superior Court Judge