Filed 4/21/16  North Kern Water Storage Dist. v. City of Bakersfield CA2/6

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| NORTH KERN WATER STORAGE DISTRICT,<br><br>    Plaintiff, Cross-Defendant and Respondent,<br><br>v.<br><br>CITY OF BAKERSFIELD,<br><br>    Defendant, Cross-Complainant and Appellant. | 2d Civil No. B260065<br>(Super. Ct. No. 56-2011-00408712-CU-CO-VTA)<br>(Ventura County) |

In 1976, the City of Bakersfield (City) entered into virtually identical 35-year "Basic Term" water supply agreements with North Kern Water Storage District (North Kern) and three other water districts.  North Kern's agreement (hereinafter "Agreement 76-89" or "the Agreement") differed from the other three in describing what was to occur after expiration of the Basic Term.  At the end of the 35-year Basic Term, the City decided to unilaterally terminate the agreements.  North Kern sued for declaratory and related relief, contending the City must continue supplying water to North Kern under the Agreement's Extension Term.  At issue is the City's continuing obligation to furnish water under the Agreement.

The trial court granted the requested relief following a 14-day trial.  Taking into account the similarities and differences between the Agreement and the other water

supply contracts, the circumstances surrounding the parties' execution of the Agreement and the document's stated purpose, the court reasonably found the parties intended to give North Kern priority rights to the water beyond the 35-year Basic Term and did not intend to allow the City to unilaterally terminate the Agreement after the Basic Term. We conclude substantial evidence supports these findings and affirm.

FACTS AND PROCEDURAL HISTORY

North Kern, which was formed in 1935, consists of approximately 60,000 acres of primarily agricultural land. It requires significant amounts of water for irrigation and ground water recharge. One of its water sources was Kern River water supplied by Tenneco West, Inc. (Tenneco). Between 1970 and 1974, North Kern purchased an average of 54,482 acre-feet of Kern River water from Tenneco each year.[1]

The City acquired all of Tenneco's Kern River water rights in 1976. The acquisition entitled the City to more than 125,000 acre-feet of Kern River water per year. The City did not need all of that water for its own use and proposed to sell some of it to four water districts: North Kern, Kern-Tulare Water District, Cawelo Water District and Rag Gulch Water District. The 1975 Final Environmental Impact Report (1975 FEIR) for the proposed project stated that "[t]he four contracts will be for a term of at least 35-years, each beginning with the 1976 irrigation season and will supply Kern River water to supplement and replace some of the existing groundwater service." It further stated that "[e]ach of the four contractors will have the right of first refusal to purchase available surplus water from the City at reasonable rates under the existing conditions. Each contract is subject to extensions of time contingent upon the needs of the City for such water."[2]

_____

[1] An "acre foot" is a unit of volume containing 43,560 cubic feet. It is defined by the volume of one acre of surface area to a depth of one foot. To put it in perspective, "[a]n average California household uses between one-half and one-acre foot of water per year for indoor and outdoor use." (Water Education Foundation, http://www.watereducation.org/general-information/whats-acre-foot.)

[2] The project also involved the sale to North Kern of a portion of the Beardsley and Calloway Canals. Although the City retained water conveyance rights in those canals, North Kern had a right of first refusal to purchase certain rights of the Kern River Canal

Consistent with the 1975 FEIR, each of the four contracts sets forth the Basic Quantity of water to be delivered by the City during the contract's Basic Term, which is "the 35-year period described in Article III, Section 3.3a." Agreement 76-89 required the City to sell and North Kern to purchase 20,000 acre-feet of nonutility Kern River water per year on a priority basis. The Agreement recognized that the quantity of water delivered during the Basic Term will vary year to year, but required a total net quantity of 700,000 acre-feet.

In contrast, during the Agreement's Extension Term, the quantity required to be sold to and purchased by North Kern is determined on a year-to-year basis. Section 3.1b of Agreement 76-89 states: "City shall, after the 35th year of this Agreement, sell to District and District shall purchase from City, a net total of Kern River water equal to the Basic Quantity herein *until modified or terminated* as provided in Article III, Section 3.3b hereof. Further, City will make available to District Borrow-Payback Water equal to the Borrow-Payback Quantity in conformance with its priority herein *until modified or terminated* as provided in Article III, Section 3.3b hereof." (Italics added.)

Section 3.3b states that "[t]he Extension Term commences immediately following the completion of the Basic Term of this Agreement. City shall continue to supply the Basic Quantity to District pursuant to District's priority provided for in Article VI, Sections 6.1 and 6.2 hereof, until City shows a need to and the implementation of a Project to divert all or any portion of the Basic Quantity for use within its boundaries or for use on City-owned property. In this connection, all other water available to City for its needs shall be first applied to City's requirements. The Extension Term hereof is on a year-to-year basis."

---

and Irrigating Company, which the City acquired from Tenneco, if the City proposed to sell all or a portion of those rights.

Section 6.1 of Agreement 76-89 gives North Kern first priority to the City's nonutility Kern River water[3] after the City meets the pre-existing obligations it assumed upon its purchase from Tenneco. Section 6.2 continues that priority during the Extension Term "subject only to City's showing a need to and the implementation of a project to divert all or any portion of said Extension Quantity of water for City's uses on City-owned property or the use of said water or portion thereof within City's boundaries. In this connection, all other water available to City for its needs shall be first applied to City for its requirements before the Extension Quantity or portion thereof shall be denied to [North Kern]." The other three contracts confirm that those districts' rights to Kern River water are subject to North Kern's first priority rights during both the Basic and Extension Terms.

Prior to commencement of the Extension Term, the City stated its intent to terminate Agreement 76-89 at the end of the 35-year Basic Term. It contended it had a unilateral right to terminate the Agreement and, as a result, stopped selling water to North Kern in January 2012.

North Kern disputed the City's interpretation of the Agreement. In October 2011, North Kern brought this action for declaratory relief, specific performance and injunctive relief. North Kern requested that the Court interpret the Agreement, pursuant to Code of Civil Procedure section 1060, and determine and declare that the City should not be permitted to terminate the Agreement at the end of the Basic Term. It further requested a permanent injunction requiring the City "to supply water under the Agreement consistent with the Court's final judgment determining and declaring the lawful construction of the Agreement and the rights and duties of the parties."

The City cross-complained against North Kern, alleging claims for declaratory relief, damages and rescission. Following the court trial, in which the parties proffered 191 exhibits and 13 witnesses, the trial court issued a 27-page Final Statement

_____

[3] The term "nonutility Kern River water" refers to the portion of the Kern River water and water rights acquired by the City which is available for sale to North Kern because it is not encumbered with pre-1976 public utility obligations to historic canal companies.

of Decision in which it rejected the City's interpretation of the Agreement. "Taking into consideration the similarities and differences between Agreement 76-89 and the other three contracts, the circumstances surrounding the parties when Agreement 76-89 was entered into and the purpose of the Agreement," the court determined "it is clear the parties intended to give North Kern priority rights to 20,000 acre-feet per year of Kern River water in the long term future even beyond the 35-years." In particular, the court found "the parties did not intend to give the City the ability to unilaterally terminate Agreement 76-89." Instead, the court concluded the parties agreed that it is the amount of water the City is obligated to sell each year during the Extension Term that may be "modified or terminated," not the Agreement itself.

The trial court further found that North Kern's priority after 35 years "would be subject to the City's shown need to and project to divert the 20,000 acre-feet per year to use the water on City owned property or within its boundaries after having used all other water the City had available." Consistent with the parties' long-standing course of performance of the Agreement, the court concluded that during the Extension Term "[e]ach year a new determination of whether the City would have water sufficient to deliver to North Kern had to occur depending on the existing conditions especially since the City was first obligated to use all other available water, a determination that could not be made without knowing current hydrologic conditions."

Based on these findings, the trial court ruled that the "City shall perform the terms and provisions of Agreement 76-89 consistent with the Final Statement of Decision" and permanently enjoined the City from taking any action inconsistent with the Agreement and Final Statement of Decision. The court retained "jurisdiction for the purpose of a party returning to [the] Court to obtain relief from violations of [the] Judgment." The City appeals.

## DISCUSSION

### A. *Standard of Review*

The principal issue before the trial court was whether Agreement 76-89 gave the City the unilateral right to terminate the Agreement at the end of the Basic

5

Term.  The City maintained it had the right to terminate the Agreement in its entirety if it shows a need to and an implemented project to divert Kern River water for use on its own property or within its boundaries.  North Kern asserted that it was the quantity of water, and not the Agreement itself, that could be "modified or terminated" on a yearly basis during the Extension Term.  Because the contract language is ambiguous on this point, significant extrinsic evidence was admitted to aid the court's interpretation.

When a trial court interprets a contract without the aid of extrinsic evidence, the appellate court reviews the trial court's contractual interpretation under a de novo standard and makes an independent determination of the meaning of the contract. (*Tin Tin Corp. v. Pacific Rim Park, LLC* (2009) 170 Cal.App.4th 1220, 1225; *Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865.)  However, "where extrinsic evidence has been properly admitted as an aid to the interpretation of a contract and the evidence conflicts," we apply a more deferential standard of review under which "a reasonable construction of the agreement by the trial court which is supported by substantial evidence will be upheld."  (*In re Marriage of Fonstein* (1976) 17 Cal.3d 738, 746-747; *Winet v. Price* (1992) 4 Cal.App.4th 1159, 1166 (*Winet*).)  "[W]hen, as here, ascertaining the intent of the parties at the time the contract was executed depends on the credibility of extrinsic evidence, that credibility determination and the interpretation of the contract are questions of fact that may properly be resolved by the [finder of fact.]" (*City of Hope Nat. Medical Center v. Genentech, Inc.* (2008) 43 Cal.4th 375, 395.)

*B.  Substantial Evidence Supports the Trial Court's*

*Interpretation of Agreement 76-89*

Under statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs its interpretation.  (Civ. Code, § 1636; *Principal Mutual Life Ins. Co. v. Vars, Pave, McCord & Freedman* (1998) 65 Cal.App.4th 1469, 1478.)  The City contends the parties intended in 1976 to grant it the right to terminate Agreement 76-89 after the Basic Term by showing a need to and an implemented project to divert Kern River water for use on its own property or within its boundaries.  The trial court disagreed, finding that it is the amount of water the City is

6

obligated to sell to North Kern that may be "modified or terminated" on a yearly basis following the Basic Term. We conclude the trial court's interpretation of the Agreement is reasonable and supported by both the language of the Agreement and the extrinsic evidence introduced at trial.

Section 3.1b of Agreement 76-89 requires that the City sell to North Kern "a net total of Kern River water equal to the Basic Quantity . . . until modified or terminated as provided in Article III, Section 3.3b hereof." The trial court determined the word "until" in this section references its subject, i.e., the City's annual duty to sell to North Kern the Basic Quantity of Kern River water. Under the court's construction, therefore, what may be "modified or terminated" is the amount of Kern River water sold by the City and purchased by North Kern each year.

Section 3.3b states that "[t]he Extension Term commences immediately following the completion of the Basic Term," and requires that the City "continue to supply the Basic Quantity to District pursuant to District's priority provided in Article VI, Sections 6.1 and 6.2 hereof, until City shows a need to and the implementation of a Project to divert all or any portion of the Basic Quantity for use within its boundaries or for use on City-owned property." Section 3.3b further clarifies that "all other water available to City for its needs shall be first applied to City's requirements," and that the Extension Term "is on a year-to-year basis."

Thus, under section 3.3b, the City is required to supply North Kern with the Basic Quantity of 20,000 acre-feet of Kern River water each year during the Extension Term "until City shows a need to and the implementation of a Project to divert all or any portion of the Basic Quantity . . . ." As in Section 3.1b, the word "until" references the subject of this sentence, which is the City's annual obligation to supply North Kern with Kern River water under its first priority rights.

The trial court explained that if, on the one hand, the City can show both a need and the implementation of a project to divert a "portion" of the available Kern River supply, then the quantity sold to North Kern is "modified" to the portion not needed by the City. In other words, if 5,000 acre-feet is needed and diverted by a project, then the

7

remaining 15,000 acre-feet is available for North Kern. If, on the other hand, the City shows a need and the implementation of a project to divert and use *all* of the Kern River supply available in a given year, then the quantity available for North Kern for that year is "terminated." Before an assessment of that quantity can be made, however, the City must first apply all other water available for its needs. And because the Extension Term is on a "year-to-year basis," the City must annually determine if it has Extension Quantity water available to sell to North Kern. This provision recognizes the possibility that even if no Kern River water is available to North Kern one year, there may be such water available in subsequent years and thus the contract remains in force.

Stated differently, the quantity of Kern River water that the City is required to sell North Kern in the Extension Term is not guaranteed each year. Unlike with the Basic Term, there is no provision for "makeup water" for any deficiencies because North Kern is not assured a certain quantity during the Extension Term. Instead, the annual quantity is variable and North Kern is only assured a first priority right to purchase the available supply each year. Specifically, the quantity is "a net total of Kern River water equal to the Basic Quantity" unless that quantity is "modified or terminated" as provided in Sections 3.1b and 3.3b for that particular year.

The City asserts the trial court erred by finding that the reference to "termination" in the Agreement did not refer to the term of the Agreement. It argues that "[t]he only reasonable, logical definition and interpretation of 'termination' as used in the Agreement would be that the term of the Agreement could end, or conclude, upon the occurrence of the stated conditions referenced in the Agreement." The word "termination," however, is not contained in any provision addressing the Extension Term. Rather, the language of Sections 3.1b and 3.3b provides that the quantity of water sold can be either "modified or terminated" on a year-by-year basis. Neither section references termination of the Agreement.

Moreover, the City's argument, while focusing on termination, ignores the word "modified," which is used in conjunction with the word "terminated" in section 3.1b. As the trial court observed, "the City has not explained in what manner it could

8

'modify' the Agreement upon a showing of a need and a project to divert. A more reasonable interpretation is that the quantity of water could be modified (something less than 20,000 acre-feet per year) or terminated (no water would be delivered that year)." Indeed, recitals in the Agreement confirm the City's intent to make available to North Kern "a long-term supply of Kern River" water in recognition of it being a "historical diverter and user of Kern River water."

As the trial court emphasized, Section 5.5 identifies the one circumstance in which the parties agreed that the City shall have the right to terminate the Agreement and, in so doing, extinguish North Kern's rights to receive water under the Agreement. This section states that "in the event of any default by District wherein the total payments in default equal FOUR-HUNDRED THOUSAND DOLLARS ($400,000), City shall have the right to terminate this Agreement and thereupon District's rights to receive any water by reason of this Agreement only shall be extinguished. Upon such termination, any and all other provisions of this Agreement, both short term and long term, shall also thereupon be extinguished." This provision demonstrates that the parties knew how to draft language authorizing the termination or extinguishment of the Agreement when that was their intent to do so. (See *Cardinal Health 301, Inc. v. Tyco Electronics Corp.* (2008) 169 Cal.App.4th 116, 132.) Such language and intent are completely absent from Sections 3.1b and 3.3b.

The trial court's interpretation is also supported by the provisions of the Agreement concerning the sale of the Beardsley and Calloway Canals. The Agreement gave the City the right to use capacity in those canals. There is nothing to suggest the parties intended that right to be subject to termination, yet that right would terminate if the City's interpretation of the Agreement were correct.

Furthermore, the City's own actions undermine its interpretation of Agreement 76-89. As the trial court noted, "Section 3.1b of the Agreement states: 'City will make available to District Borrow-Payback Water equal to the Borrow-Payback Quantity in conformance with its priority herein *until modified or terminated* as provided in Article III, Section 3.3b hereof.' (Emphasis added.) In 2012, after the City states it

9

terminated the Agreement, the City received water under these borrow-payback provisions. The City's continued compliance with this provision of the Agreement shows that not even the City treated the [entire] Agreement as terminated."

In addition, shortly after entering into Agreement 76-89, the City contracted to sell miscellaneous Kern River water to Rosedale-Rio Bravo Water Storage District. Certain terms in that contract govern the district's right to purchase water beginning January 1, 2012. In connection with water sold after that date, the contract "states that Rosedale-Rio Bravo [Water Storage District] would be entitled to receive nonutility Kern River water '*except for the twenty thousand (20,000) acre feet per year committed to North Kern.*'" (Italics added.) As the trial court stated, this demonstrates that "in 1976 the City did not expect Agreement 76-89 would end or even be likely to end in 2011."

The City claims the trial court's interpretation of the Agreement is unreasonable because once the City had shown a need for the water and projects in place to utilize the water, there would be no reason for it to keep undergoing a year-by-year determination of its demand for the water. It maintains that in that circumstance, the City would expect to have a continual, ongoing need for the water in the same or similar amounts. But this is merely an assumption, not necessarily a fact. The amount of water available to the City varies from year to year and is dependent upon a number of factors. It is possible that the City would need all or a part of North Kern's allotment of water in one year but not in the next. This explains why the parties agreed to a year-by-year assessment of the City's water needs and available supplies during the Extension Term.

The City stresses that the preamble to the Agreement states that the "City has determined that under existing conditions and for an interim period of time certain of said water and water rights will not be needed by [the] City for its own use." The City argues this language provides the best evidence of the parties' intent regarding the duration of the Agreement. Even if the City is correct, it does not mean that the interim period is limited to 35 years. If that were the case, the parties would not have created an Extension Term. A reasonable interpretation of "interim period" is the period in which the City does not have a need to and the implementation of a project to divert Kern River

10

water for use within its boundaries or for use on City-owned property. As discussed above, this period may not be continuous. There may be years during the Extension Term in which no water is available for North Kern's use and years in which all or a portion of the 20,000 acre-feet is available. It is logical to assume the City did not wish to relinquish a market for that water unless absolutely necessary.

The City contends the trial court improperly disregarded the statement of Dick Diamond, North Kern's General Manager, that North Kern's "anticipation is we will receive supplies during the extension term, not forever, but for some period of time." It is well established that evidence of an uncommunicated subjective intent offered to contradict the express terms of the contract is inadmissible. (*Winet, supra*, 4 Cal.App.4th at pp. 1167-1168.) Even if the statement is admissible, however, it is not inconsistent with the trial court's interpretation. The Agreement could effectively end if the City has an ongoing, continuous annual need for the water as provided for in the Agreement. Diamond likely was anticipating that possibility over the passage of time.

The City also argues the trial court's decision is insupportable because it binds the City to a "draconian" contract which does not reflect the current market for water. This argument ignores Section 5.1b of the Agreement, which sets forth the formula for calculating the cost of water during the Extension Term. Instead of paying the fixed annual fee of $400,000 required during the Basic Term, North Kern must pay the City based on the "Pumping Costs of producing a like amount of water from the underground basin overlain by [North Kern] District . . . ." The creation of this formula, which is calculated on a 5-year running average basis, provides further evidence of the parties' mutual intent to continue their contractual relationship beyond the Basic Term.

Finally, the City asserts that the trial court erred by overlooking extrinsic evidence it claims supports its interpretation of Agreement 76-89 and urges us to consider that evidence on appeal. The City misunderstands our standard of review. Under the substantial evidence standard, we disregard all conflicts in the evidence and indulge all reasonable inferences and ambiguities to support the findings and judgment. (*Winograd v. American Broadcasting Co.* (1998) 68 Cal.App.4th 624, 631; *Kuhn v. Department of*

11

*General Services* (1994) 22 Cal.App.4th 1627, 1632-1633.)  Applying this standard, we conclude substantial evidence supports the trial court's interpretation of the Agreement.

## C.  The Extension Term's Year-to-Year Basis
### is Valid and Enforceable

The City argues that even if the trial court's interpretation of Agreement 76-89 is reasonable, it is insupportable because it creates a perpetual contract that can never be terminated.  But "California cases have long recognized that a contract may, by its express terms, provide for a term of duration of indefinite length and without specific limitation, tied not to the calendar but to the conduct of the contracting parties." (*Zee Medical Distributor Assn., Inc. v. Zee Medical, Inc.* (2000) 80 Cal.App.4th 1, 7 (*Zee*).) "The rule is that if the contract is to remain in effect so long as one continues to perform or act in a certain manner . . . the agreement is sufficiently certain to be vital. [Citations.]" (*Zimco Restaurants v. Bartenders Union* (1958) 165 Cal.App.2d 235, 237-238) (*Zee* at p. 8.); see also *Great Western Distillery Products, Inc. v. John A. Wathen Distillery Co.* (1937) 10 Cal.2d 442, 446-447 ["The failure to *specifically* limit the duration of the contract did not fatally affect it and did not give rise to a right to terminate the contract at will without a liability for damages"].  The City acknowledges *Bradner v. Vasquez* (1951) 102 Cal.App.2d 338, 344, for the proposition that "[a] contract is not fatally defective merely because it does not provide a time presently definite for its termination."

Here, the Agreement's Extension Term is on a year-to-year basis and continues as long as there is Kern River water available for North Kern to purchase from the City that is not needed by the City pursuant to Section 3.3b.  The Agreement could effectively end if there is no such water available in the coming years.  That determination, however, must be made on an annual basis.  We are not persuaded by the City's reliance on cases involving periodic tenancies in the landlord-tenant context.  This is a water supply contract, not a landlord-tenant agreement.  The rules governing leases do not apply here.

12

Indeed, the City's argument is further undercut by its own reliance upon *Sawyer v. City of San Diego* (1956) 138 Cal.App.2d 652, 660, in which the court upheld a contract providing for permanent water service. The contract expressly stated that the realty company or its successors in interest "'shall at all times have the right to take water for use upon the land known as Del Mar Terrace.'" (*Ibid.*) The court determined that "[i]t clearly appears from the language used in the contract . . . that it was the intention of the parties that the water was to be used on the Del Mar Terrace subdivision by persons building and maintaining residences thereon and that the city, by agreeing to give them the right to use such water, 'at all times' for use thereon, was granting a permanent right to such use." (*Ibid.*) The trial court found a similar intent here, subject to the limitations imposed by Sections 3.1b and 3.3b of the Agreement.

### D. The Trial Court did Not Abuse its Discretion by Ordering Specific Performance and Injunctive Relief

The City contends the trial court erred by issuing an unnecessary and improper "advisory opinion" in connection with the City's demand and need for water, and by imposing injunctive relief and ordering specific performance without evidence of any breach of Agreement 76-89. It asks us, at a minimum, to delete Sections II (C) and (D) of the court's Final Statement of Decision. We decline to do so. We conclude the trial court properly adjudicated and declared the parties' rights and obligations under the Agreement's Extension Term. (Code Civ. Proc., § 1060.)

Section 12.2e of the Agreement states that "[i]f any matter essential to this Agreement is left to the future determination of the parties hereto, each party is required to accept a reasonable determination as herein provided. It is recognized that this Agreement is between two public bodies concerned with an extensive water service project in the public interest, which involves the long-term and historical use of a vital natural resource of unpredictable supply. *In the unlikely event that said entities are unable to agree upon a reasonable and equitable solution to matters left to future determination, the matter shall be submitted to and determined by a court of competent jurisdiction.*" (Italics added.)

13

North Kern invoked this provision in its complaint. It alleged that the parties are "unable to agree upon a reasonable and equitable solution to matters left to future determination under the Agreement, including but not limited to, an actual controversy over the proper construction of [Sections] 3.1(b), 3.3(b), 5.1(b), 6.1, 6.2, 6.4 and 12.2(d)(e) and (f), and 12.3 of the Agreement." It specifically requested, among other things, a permanent injunction requiring the City "to supply water under the Agreement consistent with the Court's final judgment determining and declaring the lawful construction of the Agreement and the rights and duties of the parties."

The trial court correctly determined the City did not have the unilateral right to terminate the Agreement at the end of the Basic Term. Instead, the City must annually assess whether it has Extension Quantity water available for North Kern to purchase for that particular year. The parties disagreed as to how that amount should be calculated. The City maintained that because it needed the water for its own use, it could decline to supply water under the Agreement. But the City must do more than simply declare a subjective need for the water. Before modifying or terminating the quantity of water sold to North Kern in any given year, the City must show (1) a need to divert water from the Kern River, (2) an implemented project to divert water from the Kern River for use within its boundaries or on City-owned property and (3) that all other water available to the City has first been utilized for the project.

Based on the extensive evidence presented during trial, the court determined the City had failed to make such a showing. Specifically, it found the City did not show a need to divert the water, an implemented project for such diversion or the unavailability of other water for the alleged project. This portion of the court's Final Statement of Decision not only confirms that the City breached the Agreement by deciding to unilaterally terminate it at the end of the Basic Term, but it also clarifies what the City may or may not do regarding the sale and delivery of Kern River water during the Extension Term. The City has not demonstrated that these clarifications were unnecessary to resolve the present controversy surrounding the City's obligations to

14

North Kern. To the contrary, they provide necessary guidance to the parties as they move forward under the Extension Term.

By way of example, the trial court found that "before [the] City can deny Extension Quantity water to North Kern the City must first apply all other water available to the City for its needs." This determination resolves the existing uncertainty or controversy between the parties on this issue, and will direct the parties in the future so as to reduce the prospect of subsequent litigation. (See *Meyer v. Sprint Spectrum L.P.* (2009) 45 Cal.4th 634, 647 [purpose of declaratory relief "is to liquidate doubts with respect to uncertainties or controversies which might otherwise result in subsequent litigation"].)

Moreover, "[a]n equity court has broad powers to fashion a remedy. [Citation.] It may create new remedies to deal with novel factual situations." (*Oceanside Community Assn. v. Oceanside Land Co.* (1983) 147 Cal.App.3d 166, 177; see also *Advanced Micro Devices, Inc. v. Intel Corp.* (1994) 9 Cal.4th 362, 390 [equitable relief is flexible and allows "new methods of relief for new types of wrongs."].) The trial court's ruling is directed at curing the wrong committed by the City when it decided to unilaterally terminate the Agreement at the end of the Basic Term. While the exact quantity of Kern River water that will be available for sale to North Kern each year during the Extension Term is unknown, the court's carefully constructed decision explicitly describes the City's obligations in making that annual determination. The court did not abuse its discretion by enjoining the City from taking actions inconsistent with those obligations.

Nor has the City shown that enforcement of the Agreement through specific performance was improper. The City relies upon *Golden West Baseball Co. v. City of Anaheim* (1994) 25 Cal.App.4th 11, for the proposition that specific performance is not available where there has been no breach of contract. But in this case there was a breach. The trial court found that the City had improperly terminated at least part of the Agreement by refusing to sell any Kern River water to North Kern after expiration of the Basic Term.

15

Lastly, the trial court did not err by retaining jurisdiction to enforce its declaratory judgment and orders for specific performance and permanent injunction. "[R]etention of jurisdiction by the court for the purpose of interpreting and enforcing its judgment is within the scope of declaratory relief." (*Dawson v. East Side Union High School Dist.* (1994) 28 Cal.App.4th 998, 1044-1045.) A court also may retain jurisdiction to ensure the parties' compliance with orders of specific performance and injunctive relief. (*Hutcherson v. Alexander* (1968) 264 Cal.App.2d 126, 134.) We have considered each of the City's contentions on appeal and conclude it has failed to demonstrate error.

DISPOSITION

The judgment is affirmed. Respondent shall recover its costs on appeal.

NOT TO BE PUBLISHED.

PERREN, J.

We concur:

GILBERT, P. J.

YEGAN, J.

16

Tari L. Cody, Judge

Superior Court County of Ventura
_____

Duane Morris LLP, Colin L. Pearce, Jolie-Anne S. Ansley, City Attorney's Office, Virginia A. Gennaro for Defendant, Cross-complainant and Appellant.

The Law Offices of Young Wooldridge LLP, Scott K. Kuney, Douglas A. Gosling, Price, Postel & Parma LLP, Timothy E. Metzinger for Plaintiff, Cross-defendant and Respondent.