Filed 4/23/21  Vivera Pharmaceuticals v. Alternate Health Corp. CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| VIVERA PHARMACEUTICALS INC., | B306296 |
| Plaintiff, Cross-Defendant, and Appellant, | (Los Angeles County Super. Ct. No. 18STCV08361) |
| v. | |
| ALTERNATE HEALTH CORP. et al., | |
| Defendants, Cross-Complainants, and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Richard L. Fruin, Jr., Judge.  Affirmed.

Saied Kashani for Plaintiff, Cross-Defendant, and Appellant.

Markham & Read, John J. E. Markham, II, for Defendants, Cross-Complainants, and Respondents.

Respondents Alternate Health Corp. and Alternate Health USA, Inc. (collectively, Alternate) held a license for a sublingual (under the tongue) dissolving tablet for delivering marijuana-derived compounds. Appellant Vivera Pharmaceuticals Inc. (Vivera) claimed that the license was restricted to nutraceutical (nonpharmaceutical) products, a claim Alternate disputed. The parties sought relief in the trial court to resolve the dispute. After a bench trial, the trial court agreed with Alternate, that its license gave Alternate the rights to nutraceutical *and* pharmaceutical applications. Vivera appeals and contends that the trial court erred in interpretating the agreement. We disagree and affirm the judgment.

## BACKGROUND

I.      The Agreement

Nonparty EFT Global Holdings Inc., doing business as Sentar Pharmaceuticals (Sentar), held pending patent applications to a sublingual dissolving tablet delivery system for tetrahydrocannabinol (THC) or cannabidiol (CBD) compounds and other compoundable products. CBD and THC compounds are derived from the hemp or marijuana plant. Sentar and Alternate entered into a license agreement (the Agreement) for the sublingual delivery system. Per section 2.1 of that Agreement, Sentar granted Alternate "an exclusive license for the use of CBD and THC (licensee DOES NOT have rights to compound pharmaceuticals beyond THC without first seeking written permission from Sentar, such approval will not be unreasonably

withheld) and other compoundable nutraceutical[1] products in tablet form" using the licensed method and process described in the "Field of Use." The Agreement defined " 'Field of Use' " as "sublingual delivery systems, including CBD and THC and other compoundable nutraceutical products (non-pharmaceutical) in tablet form only, under the Licensor Patent Rights."

After entering into the Agreement, Alternate submitted securities filings to a government agency in anticipation of a private placement of securities in which it described the Agreement. In one filing, Alternate stated its intent to use "proceeds of the private placement for commercialization of its recently acquired CBD delivery system licenses, expansion of its toxicology laboratory business . . . and for targeted revenue generating acquisitions in the health care industry." In three other securities filings, Alternate referred to its "exclusive agreement for non-pharmaceutical sublingual delivery of CBD and THC." The filings said that under the terms of the Agreement, Alternate had a license to "patented Sublingual Delivery Systems to administer CBD and THC nutraceuticals in tablet form" and described the consideration paid for the "ongoing development and commercialization of the Technology, and assistance in obtaining regulatory approvals and permits for related products."

II.    Vivera sues Alternate to clarify the Agreement's scope

Vivera is a startup seeking to exploit the sublingual delivery system for CBD and THC in pharmaceutical applications. According to Vivera, Sentar licensed the sublingual

---

[1] As agreed to by the parties in their stipulated facts, "nutraceutical" means "nonpharmaceutical."

3

delivery system technology to it for *pharmaceutical* applications.[2] A dispute therefore arose between Alternate and Vivera regarding the scope of the Agreement between Alternate and Sentar.

Vivera sued Alternate and sought a declaration that Vivera could exploit the sublingual delivery system for pharmaceutical products without violating the exclusive license granted in the Agreement. Alternate cross-complained for intentional interference with contractual relations and for declaratory and injunctive relief, seeking, among other things, a declaration it held an exclusive license to sublingual technology for CBD and THC tablets.

The parties stipulated that the sole issue to be tried was whether the Agreement was restricted to nutraceutical products, as contended by Vivera, or whether it also granted Alternate use of the technology for pharmaceutical products containing THC or CBD. The parties agreed to a bench trial on limited stipulated facts and exhibits, which included the Agreement and the aforementioned securities filings. The stipulated facts included that nutraceutical (nonpharmaceutical) products are dietary supplements that cannot make explicit efficacy claims and cannot be marketed to treat or to cure illness or disease. Nutraceutical products also do not require approval from the FDA, proof of safety and efficacy, or testing or clinical trials. Pharmaceutical products, in contrast, can make explicit efficacy claims and can be marketed to treat or to cure an illness or disease. They therefore require FDA approval and must have proof of safety and efficacy,

---

[2] Alternate's cross-complaint and trial brief asserted that Paul Edalat controls both Vivera and Sentar.

and testing or clinical trials.  The parties also stipulated that to date no party has used the licensed technology to sell any products.

After a brief hearing, the parties submitted posttrial briefs.  Vivera argued that the Agreement was limited to nutraceutical applications of the sublingual tablet system for CBD and THC.  According to Vivera, the Agreement confined the license to that application, except, admittedly, in one place, section 2.1.  That section, Vivera argued, contained a "misprint," in that it used the word "pharmaceutical" instead of "nutraceutical."  Vivera also interpreted Alternate's statements in securities filings as admissions that the Agreement covered only nutraceutical applications.  Vivera thus sought a declaration that the Agreement was restricted to nutraceutical products, whether or not the products contained THC or CBD, and the Agreement did not grant Alternate any pharmaceutical applications.

Alternate argued to the contrary, that its license granted the right to compound CBD and THC nutraceutical *and* pharmaceutical products.  Alternate thus argued that the Agreement was unambiguous and that section 2.1's reference to pharmaceutical products was not a misprint.

The trial court found in Alternate's favor, that the Agreement includes pharmaceutical products containing THC or CBD, as well as nutraceutical products that utilize the licensed patent applications.  The trial court explained that the Agreement was not ambiguous on its face and only became so when read with the parol evidence.  Because the Agreement was not ambiguous on its face and Vivera's interpretation of it was strained, the trial court found the parol evidence inadmissible.  The trial court also rejected Vivera's contention that Alternate's

5

counsel had conceded in arguments before the trial court that the license does *not* include pharmaceutical use of CBD.  Accordingly, the trial court entered judgment in Alternate's favor.

Vivera timely appealed.

## DISCUSSION

I.     Interpretation of the Agreement

The question presented is whether the Agreement gives Alternate the right to use the sublingual delivery system for pharmaceutical *and* nutraceutical CBD and THC products, or instead whether the Agreement limits it to nutraceutical ones. The issue therefore is one of contract interpretation.

Contract interpretation is a judicial function by which trial courts must give effect to the parties' mutual intent when the contract was executed.  (*Jade Fashion & Co., Inc. v. Harkham Industries, Inc.* (2014) 229 Cal.App.4th 635, 651–652.) Ordinarily, the parties' intent is a legal question determined by reference to the contract's terms without considering extrinsic evidence of any prior agreement or contemporaneous oral agreement to vary or contradict the clear and unambiguous terms of a written, integrated contract.  (*Ibid.*; Code Civ. Proc., § 1856, subd. (a).)  However, extrinsic evidence is admissible to interpret an agreement when a material term is ambiguous.  (*Jade*, at p. 651.)

When parties dispute the meaning of a contract term, the trial court first determines whether the term is ambiguous, that is, reasonably susceptible to either of the meanings urged by the parties.  (*Winet v. Price* (1992) 4 Cal.App.4th 1159, 1165.)  In making this determination, the trial court provisionally receives, without actually admitting, any extrinsic evidence relevant to

6

show the contract could or could not have a particular meaning. (*Pacific Gas & E. Co. v. G.W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 37.) If, in light of the contract's language and the extrinsic evidence as to its meaning, the trial court determines the language is reasonably susceptible to either of the meanings urged by the parties, the trial court moves to the second step, determining what the parties intended the contract term to mean. (*Winet*, at p. 1165.) If, in light of the extrinsic evidence, the language is reasonably susceptible to the interpretation urged, the extrinsic evidence is admitted to aid in interpreting the contract. (*Ibid.*) Extrinsic evidence is not, however, admissible to flatly contradict an agreement's express terms. (*Consolidated World Investments, Inc. v. Lido Preferred Ltd.* (1992) 9 Cal.App.4th 373, 379.) "[E]xtrinsic evidence cannot be used to show that when the parties said 'Bunker Hill Monument' they really meant 'the Old South Church' or that when they said 'pencils' they really meant 'car batteries.' " (*Curry v. Moody* (1995) 40 Cal.App.4th 1547, 1554.)

The trial court's ruling on the first step, the threshold question of ambiguity, is a question of law subject to independent review. (*Winet v. Price*, *supra*, 4 Cal.App.4th at p. 1165.) The same is true as to the trial court's ruling on the second step if no extrinsic evidence was introduced as to the contract's meaning or if extrinsic evidence was not in conflict. (*Id.* at pp. 1165–1166.) We apply the substantial evidence test only when conflicting evidence was introduced as to the meaning of the contract term and uphold any reasonable construction of the contract supported by substantial evidence. (*Id.* at p. 1166.) We are not bound here by the trial court's interpretation of the Agreement, because its determination was not based on conflicting extrinsic evidence.

7

(See, e.g., *Tin Tin Corp. v. Pacific Rim Park, LLC* (2009) 170 Cal.App.4th 1220, 1225.)

Here, Vivera contends that the license is confined to nutraceutical applications, notwithstanding language to the contrary in section 2.1 of the Agreement. Applying the steps described above, the first issue is whether section 2.1 is reasonably susceptible to the interpretation Vivera urges. Section 2.1 states, Sentar "grants to [Alternate] an exclusive license for the use of CBD and THC (licensee DOES NOT have rights to compound *pharmaceuticals* beyond THC without first seeking written permission from Sentar, such approval will not be unreasonably withheld) and other compoundable nutraceutical products in tablet form." (Italics added.) On its face, section 2.1 thus grants Alternate a license to use the delivery system for (1) CBD, (2) THC, and (3) other nutraceutical products. The parenthetical's reference to "pharmaceuticals" shows that the license includes pharmaceuticals, except that Alternate must get permission before using the delivery system for "pharmaceuticals beyond THC."

To make section 2.1 reasonably susceptible to an interpretation that the license *does not* include pharmaceuticals, the section must be rewritten—which is exactly what Vivera asks. Vivera asserts that the word "pharmaceuticals" in the parenthetical was a misprint and that the parties intended to use the word "nutraceuticals." To show that there was a misprint, Vivera reads the phrase "other compoundable nutraceutical products" later in the sentence as modifying the reference to CBD and THC at the beginning of the sentence. Thus, according to Vivera, CBD and THC are examples of *other* compoundable nutraceuticals. Under this interpretation, the license is for

8

(1) nutraceutical applications of CBD and THC, and (2) other compoundable nutraceutical products, except Alternate must get permission to use the technology for nutraceuticals beyond THC. This is a strained and odd interpretation in that the section would give Alternate a license for nutraceutical uses of CBD and then take it away.  The parenthetical makes more sense as written because the license then concerns two applications, nutraceutical *and* pharmaceutical uses of CBD and THC.  The parenthetical places a condition on the exclusive license as to one of the two applications, pharmaceuticals "beyond THC."[3]

To further aid its strained interpretation of the Agreement, Vivera turns to other tenets of contract interpretation, i.e., that the whole of a contract is to be taken together so as to give effect to every part, with each clause aiding in the interpretation of another, and an interpretation giving effect to all provisions is preferred to one rendering any part of the contract meaningless. (Civ. Code, § 1641; Code Civ. Proc., § 1858.)  Vivera posits that other parts of the Agreement support its interpretation, in particular the definition of "Field of Use," a term used throughout the Agreement.  " 'Field of Use' " is defined as "sublingual delivery systems, including CBD and THC and other compoundable nutraceutical products (non-pharmaceutical) in

---

[3] Vivera appears to make an alternative argument that if section 2.1's parenthetical is credited at all, it grants only pharmaceutical use of THC (not CBD), because there was no evidence Alternate ever sought consent to use the technology for pharmaceutical CBD.  However, whether Alternate ever sought consent does not necessarily mean that the parenthetical precludes seeking consent.  In any event, the parties stipulated that to date no party has used the licensed technology to sell *any* products.

tablet form only, under the Licensor Patent Rights." Vivera argues that the parenthetical reference to "non-pharmaceutical" modifies everything that comes before it, including CBD and THC. That argument might make more sense if the parenthetical came right after the references to CBD and THC. Instead, it comes after "nutraceutical products." "Nonpharmaceutical" thus does not operate as a modifier in that sentence. It operates to define and clarify that nutraceutical is another word for nonpharmaceutical. Indeed, the parties' written trial stipulation, which Vivera's counsel drafted, similarly put "non-pharmaceutical" in parentheses after "nutraceutical products" to clarify for the reader that a nutraceutical product is a nonpharmaceutical one. Otherwise, the Field of Use provision does not contradict section 2.1 or prove that the license is for nutraceutical products only. Rather, it is consistent with a grant of a license for CBD, THC, *and* other nutraceutical products, subject to the limitation in section 2.1's parenthetical.

Vivera next cites section 2.5 to show that the Agreement does not apply to pharmaceutical applications. Section 2.5 states, "Licensor [Sentar] expressly reserves the right to use License Patent Rights and associated technology for its purposes, but not for CBD or THC derived products under the Field of Use." Vivera argues that if section 2.1 grants pharmaceutical uses of CBD and THC, then section 2.5 is a nullity because there was nothing left to reserve. That is incorrect. Section 2.5 reserves a right to the technology except for CBD and THC-derived products. Sentar may otherwise use the technology.

In arguing that the Agreement as a whole shows that section 2.1 contains a misprint, Vivera analogizes this case to *Brawner v. Wilson* (1954) 126 Cal.App.2d 381. In that case, a

10

lease provided that the lessor was to pay 60 cents per "K.W.H." for water. (*Id.* at p. 384.) The court admitted parol evidence to show that the lease was supposed to say 60 cents for use of a horsepower pump. (*Ibid.*) The court agreed the lease clearly contained a typographical error, in part because paying 60 cents per kilowatt hour was an absurdity, as it was 60 times the cost of operating the pump. (*Ibid.*)

Unlike *Brawner*, no absurdity appears on the face of the Agreement here. On this record, there is nothing absurd about the license granting rights to nonpharmaceutical *and* pharmaceutical applications, especially when marijuana-related products are at issue. There is, for example, no showing as in *Brawner* that the consideration Alternate gave for the license was wholly inadequate for both applications. What Vivera thus minimizes as a misprint akin to a typographical error is more like asking us to vary the terms of the contract, to substitute "battery" for "pencil." (See, e.g., *Consolidated World Investments, Inc. v. Lido Preferred Ltd.*, *supra*, 9 Cal.App.4th at p. 379; *Thrifty Payless, Inc. v. Mariners Mile Gateway, LLC* (2010) 185 Cal.App.4th 1050, 1061 [term stating "each" party has termination right is not reasonably susceptible to interpretation giving only one party termination right]; *Curry v. Moody*, *supra*, 40 Cal.App.4th at p. 1555 [" 'payable at the time of sale of the house' " cannot be reasonably construed as " 'payable from the inception of the contract' "].) "Pharmaceutical" and "nutraceutical" are two different words having opposite, technical meanings in a specialized area. No misprint is readily apparent.

Vivera thus turns to extrinsic evidence, i.e., the securities filings, to show that the license was limited to nutraceutical applications. The trial court found that since the Agreement was

11

unambiguous, extrinsic evidence was inadmissible.  Even if admissible, the trial court found it unpersuasive.  We agree that even if the extrinsic evidence were properly considered, it does not show that Vivera's interpretation of the Agreement is correct.  True, Alternate described the Agreement as one for "*non-pharmaceutical* sublingual delivery of CBD and THC."  (Italics added.)  Alternate also said it had a license to "patented Sublingual Delivery Systems to administer CBD and THC *nutraceuticals* in tablet form."  (Italics added.)  But these statements are accurate and do not contradict the Agreement.  That is, the Agreement includes nonpharmaceutical sublingual delivery of CBD and THC.  The securities filings merely state that Alternate entered into an Agreement for those uses.

Vivera cites no law for its assertion that the securities filings had to describe fully all rights subject to the license.  Indeed, Alternate also did not mention that the license included "other nutraceutical products."  Yet, Vivera does not dispute that the Agreement included such products.  Also, the securities filings refer to "ongoing development and commercialization of the Technology, and assistance in obtaining regulatory approvals and permits for related products."  The trial court found that this showed Alternate's intent to get FDA approval, which was only necessary for pharmaceutical applications according to the parties' trial stipulation.  Per that stipulation, nutraceutical products do not require FDA approval, proof of safety and efficacy, and testing or clinical trials, as opposed to pharmaceutical products which do require those things.  In short, the limited extrinsic evidence before the trial court was insufficient to show that the parties intended to exclude pharmaceutical applications.

12

We therefore conclude that, as a matter of law, the Agreement is not reasonably susceptible to the interpretation urged by Vivera.

## II. Alternate did not concede any issue.

Vivera contends that Alternate's trial counsel conceded in oral argument before the trial court that the license granted nutraceutical applications for THC and CBD and only pharmaceutical ones for THC. However, a judicial concession or admission occurs when a party judicially admits a fact the opposing party agrees is true. (*Barsegian v. Kessler & Kessler* (2013) 215 Cal.App.4th 446, 452.) The admission can occur via a statement by counsel if it was a clear and unambiguous concession of a matter at issue and was not made improvidently or unguardedly. (*Gordon v. Nissan Motor Co., Ltd.* (2009) 170 Cal.App.4th 1103, 1112; *Fassberg Construction Co. v. Housing Authority of City of Los Angeles* (2007) 152 Cal.App.4th 720, 752.)

As an initial matter, it is not clear that Vivera agrees the alleged admission is true. Rather, Vivera's primary position is that it is not true, that the Agreement does not include pharmaceutical applications at all. Vivera only agrees that the admission is true as an alternative if it loses on its primary contention.

In any event, no unambiguous concession was made. The alleged concession was made at the pretrial hearing in the context of discussing the issue to be tried. Vivera's counsel had just framed the issue as whether the Agreement confined Alternate to nonpharmaceutical applications, as Vivera was pursuing clinical trials for pharmaceutical ones. Alternate's counsel then said, "Yes. The issue is a little narrower. They got pharmaceuticals. We got nutraceuticals with one exception. In

13

the license it says that we have the right to market and do the licensing thing with THC. The license agreement itself—I am just reading one—two sentences from it: 'licensor,' that would be [Sentar], 'hereby grants to licensee an exclusive license for the use of CBD and THC, parentheses. 'Licensee,' Alternate Health, 'does not have rights to compound pharmaceuticals beyond THC.' So we're contending that they're marketing THC pharmaceuticals. And if they are doing clinical trials on it, maybe they are, maybe they are not, that's not part of the stipulation. Because of what that grant says, we contend that you should not be mark[et]ing THC. Our dec relief that we seek is simply that the contract grants exclusive license for ten years starting in 2017, so it's still alive, grants for ten years an exclusive license to market THC nutraceutically and pharmaceutically as I just read."

These statements are not a clear and unambiguous concession that Alternate's license was for pharmaceutical applications for THC only and not also for CBD. Rather, counsel could have been merely agreeing what the dispute was about: Vivera was claiming it "got pharmaceuticals" and Alternate "got nutraceuticals with one exception." Counsel was therefore framing the dispute, not making a concession about how to resolve it. Also, when Alternate's counsel pointed out that Vivera was marketing THC pharmaceuticals, he merely then countered that Alternate had the license to market THC pharmaceutically and nutraceutically. His failure to mention CBD is of no moment, given that the discussion was focused on Vivera's marketing of pharmaceutical THC.

Moreover, why would Alternate's counsel have made a concession contradicting the parties' *stipulation* that the issue to

14

be tried was whether the Agreement was "restricted to nutraceutical products (non-pharmaceutical)" or whether the Agreement "also granted to [Alternate] the use of the subject technology for pharmaceutical products" containing THC or CBD? Alternate said in its trial and posttrial briefs that its position was it had rights to compound nutraceutical and pharmaceutical CBD and THC products. Thus, based on the oral statements, the stipulation, and briefing, Alternate's counsel did not make an unambiguous concession that its license was limited to pharmaceutical THC or to nutraceutical products.

III.    Modification of the judgment is unnecessary

The judgment states that the Agreement "includes pharmaceutical products containing THC (Tetrahydrocannabinol) or CBD (cannabidiol) as well as nutraceutical products that utilize the licensed patent applications." Vivera asks us to modify the judgment to include section 2.1's parenthetical, i.e., that "licensee DOES NOT have rights to compound pharmaceuticals beyond THC without first seeking written permission from Sentar, such approval will not be unreasonably withheld." Although an appellate court may modify a judgment and order entry of the proper judgment (Code Civ. Proc., § 43), we see no reason to modify the judgment here. The judgment is a simple and correct statement of what the Agreement provides and in no way contradicts it or otherwise writes the parenthetical out of the Agreement.

15

## DISPOSITION

The judgment is affirmed.  Alternate Health Corp. and Alternate Health USA, Inc., shall recover their costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


                                   EDMON, P. J.


I concur:



    EGERTON, J.



    SALTER, J.*

---

**\*** Judge of the Orange County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

16