Filed 5/10/22  Marriage of Donohoe & Zaorski CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| In re the Marriage of MARTHA J. DONOHOE and JAMES M. ZAORSKI. | H046846<br>H047286<br>(Santa Clara County<br> Super. Ct. No. 2008-6-FL000003) |
| MARTHA J. DONOHOE,<br><br>    Appellant,<br><br>    v.<br><br>JAMES M. ZAORSKI,<br><br>    Respondent. | |

Appellant Martha Donohoe and respondent James Zaorski divorced in 2009.  In connection with their divorce, they entered into a marital settlement agreement (MSA), which provided that Zaorski would pay Donohoe an equalizing payment under certain circumstances.  In 2016, Zaorski sold his interest in a company he founded.  It is undisputed that Zaorski owes Donohoe an equalizing payment based on his "proceeds"— as that term is used in the MSA—from the sale.  However, the parties dispute the amount of the payment and whether Zaorski owes postjudgment interest on the equalizing payment.

In orders issued on February 22, 2019 and July 19, 2019, the trial court resolved the parties' disputes.  On appeal from those orders, Donohoe argues that the trial court

erred by (1) concluding that a special cash dividend Zaorski received in connection with the sale does not constitute "proceeds" for purposes of calculating the equalizing payment; (2) ordering postjudgment interest only from the date she filed her motion to enforce the MSA; and (3) permitting Zaorski to satisfy what Donohoe characterizes as a personal debt out of the proceeds, thereby improperly reducing the equalizing payment. Donohoe also argues that one of the court's orders, which purports to resolve a tax-related dispute, is ambiguous.

For the reasons set forth below, we affirm the July 19, 2019 order but reverse the February 22, 2019 order and remand with directions.

## I.   BACKGROUND

### A.   *The Parties' Divorce and the MSA*

The parties married in 1987.  In 2008, they separated, and Donohoe petitioned for dissolution of their marriage.  At that time, Zaorski was CEO of Sequoia Retail Systems, Inc. (Sequoia), a company he started in the mid-1980's.  Donohoe worked for the Santa Clara County District Attorney's Office.

The parties entered into an MSA.  In November 2009, the superior court entered a judgment of dissolution incorporating that MSA.

The MSA awarded Donohoe her CalPERS pension as her sole and separate property and awarded Zaorski all Sequoia stock and stock options as his sole and separate property.  The MSA also provided that, under certain circumstances, Zaorski would pay Donohoe an equalizing payment.  Specifically, paragraph 13 of the MSA stated, in relevant part:  "To equalize the allocation of community assets and debts, and in settlement of all claims between them, the Court will reserve jurisdiction over the issue of an equalizing payment by Respondent to Petitioner in the event of Respondent's disposition or exchange of [Sequoia] stock shares and options.  If between the date of Judgment and November 30, 2019, Respondent or his estate enters into an agreement to

2

dispose of the shares and options in Sequoia . . . and the proceeds of this disposition exceed the actuarial value of Petitioner's CalPERS pension at the date of disposition, based upon the total CalPERS service credit years as of June 30, 2008, then Respondent will pay Petitioner, or her estate, 30% of the proceeds that exceed the value of Petitioner's CalPERS pension. That payment shall be made within thirty (30) days of the valuation of the CalPERS pension. The parties will collaborate and agree on a mutually acceptable actuary to determine the value of Petitioner's CalPERS pension. . . . The parties further agree to collaborate and agree on a mutually acceptable business appraiser to determine the value of Respondent's disposition or exchange of Sequoia Retail Systems stock shares and options. . . ."

Paragraph 6 of the MSA addressed certain tax implications of the dissolution. It provided: "Except as provided herein, the division of the property and transfer of all property between the parties, both real and personal, as set forth in this Stipulated Judgment is between spouses, is incident to the dissolution of the parties' marriage, is occurring within one year of the date on which their marriage ceases, and is related to the cessation of their marriage. Pursuant to the intentions of the parties and the provisions of the Internal Revenue Code §1041, no gain or loss shall be recognized by either party as a result of the transfer of property between them, including cash, and the basis of the transferee in the property shall be the adjusted basis of the transferor. Notwithstanding the fact that there is no taxable event created by the division of property and transfers in this agreement, each party is nevertheless solely responsible for any tax ramifications upon the disposition of any property awarded to them under this Stipulated Judgment."

### B.     *The Sale of Sequoia to Blackboard*

Blackboard offered to purchase Sequoia for $22 million in early 2016. At that time, Sequoia had approximately $5 million in cash reserves. Blackboard's offer letter included a provision allowing Sequoia to retain and distribute that money to its

3

shareholders as a cash dividend. According to Zaorski, that provision clarified that Blackboard was not buying Sequoia's cash reserves. Sequoia accepted the offer and entered into a formal written merger agreement with Blackboard in May 2016.

At the special meeting during which Sequoia's board of directors approved the merger agreement, the board also declared a special cash dividend. The board minutes stated: "whereas, in connection with the transactions contemplated by the merger, a dividend of $2.46 per share is being declared." Sequoia board member Dean Samos testified: "We paid a dividend because there was a merger. If there was no merger, there would be no dividend." Sequoia had never previously paid a dividend.

Zaorski received his dividend from Sequoia in the amount of $2,372,815.15 on May 26, 2016.

Zaorski promptly informed Donohoe of the transaction and, in June 2016, she obtained an appraisal of her CalPERS pension. The appraiser valued Donohoe's pension at $2,820,985.26. Zaorski accepted the valuation by e-mail on June 16, 2016. In the same e-mail, Zaorski proposed using the price Blackboard paid per share to value his Sequoia stock rather than a business appraiser's valuation.

On July 19, 2016, Zaorski received an initial distribution of $5,382,757.16 from Blackboard (the July 2016 distribution), a partial payment for the shares of Sequoia stock that he owned prior to the merger. Most but not all of the July 2016 distribution—$4,395,560—was derived from formerly community property and thus is subject to the equalizing payment provision of the MSA. On September 8, 2016, Zaorski received an additional distribution of $117,081.31 (the September 2016 distribution). A portion of that distribution also is subject to the equalizing payment provision of the MSA.

### C.    *The Parties Dispute the Amount of the Equalizing Payment*

The parties agreed that an equalizing payment was due under the MSA but disagreed as to how to calculate it; given the dispute, Zaorski made no payment to

4

Donohoe.[1]  Accordingly, on April 11, 2017, Donohoe filed a request for order requiring Zaorski to make the equalizing payment.  In a supporting brief, she argued that—for purposes of calculating the payment—the cash dividend should be considered proceeds from the sale of Zaorski's Sequoia stock.  She further argued that Zaorski was solely responsible for paying any tax liability incurred in connection with the sale of his Sequoia stock.  Donohoe requested postjudgment interest accruing from July 16, 2016.

Zaorski initially responded that the equalizing payment should be calculated based on after-tax net proceeds and that the cash dividend did not constitute proceeds.  He later changed course slightly on the tax issue, arguing in both his trial brief and in his written closing argument that the equalizing payment should be calculated based on gross proceeds but that his tax basis in those proceeds should transfer to Donohoe, such that she would be liable for the associated taxes.  Zaorski further argued that no postjudgment interest was due because the amount of the equalizing payment remained uncertain.

### D.      The February 2019 Order

A court trial on Donohoe's request for order took place over two days in August and October of 2018.  In an order filed on February 22, 2019, the trial court (1) ordered that the cash dividend was not included in the proceeds for purposes of calculating the equalizing payment; (2) ordered that Donohoe "receive her equalizing payment after the taxes have been paid by the party responsible, [Zaorski], . . . but calculated as a percentage of the gross proceeds"; (3) reserved jurisdiction over the escrow payment[2]; and (4) awarded Donohoe interest on the equalizing payment "retroactive to the date of

---

[1] Zaorski eventually paid Donohoe $499,856 in December 2018.
[2] A portion of the funds paid by Blackboard to purchase Sequoia were held in escrow, including $755,814.38 for Zaorski's shares.  Zaorski was expected to receive one or more escrow distributions.  The trial court reserved jurisdiction over the equalizing payment associated with those anticipated future distributions.

5

filing of [her] motion on April 11, 2017, acc[ru]ing at the rate of 10%." Donohoe timely appealed that order, giving rise to case No. H046846.

### E. The Escrow Distribution and the July 2019 Order

In April 2018, Blackboard notified Zaorski that it intended to deduct nearly $94,000 from his escrow distribution to reimburse the company for attorney fees and costs it incurred in responding to discovery propounded on it by Donohoe in connection with this matter. In June 2018, Zaorski filed a request for order. Among other things, he requested that any reduction in his escrow payment from Blackboard for such fees and costs "be allocated to [Donohoe] and deducted from any recovery the court determines that she might be due." He likened the fees and costs to post-separation debt incurred by Donohoe and argued that the court should exercise its equitable powers to allocate that debt to Donohoe.

On December 31, 2018, Zaorski received a distribution of $397,143.05 from the portion of the sale proceeds that had been held in escrow (the December 2018 distribution or the escrow distribution). Blackboard deducted $93,852 from Zaorski's portion of the escrow distribution to reimburse the company for legal fees it incurred in responding to Donohoe's discovery requests.

In July 2019, following briefing and a hearing, the trial court issued its ruling on Zaorski's June 2018 request for order. The court found that "[a]ny reduction in the escrow payment due to [Zaorski] stemming from any third party legal fees will not be deemed a separate debt of [Zaorski]. The net proceeds from [the escrow] payment will be divided between the parties pursuant to the order filed February 22, 2019, without any offset, reallocation, or assignment of responsibility between the parties." Donohoe timely appealed the July 2019 order, giving rise to case No. H047268.

This court ordered Donohoe's two appeals considered together for the purposes of record preparation, briefing, oral argument, and disposition.

## II.     DISCUSSION

### A.     *The Trial Court Did Not Err in Concluding That the Special Dividend Does Not Constitute "Proceeds" for Purposes of the MSA*

#### 1.     *Legal Principles and Standard of Review*

A marital settlement agreement that has been incorporated into a dissolution judgment is construed under the statutory rules governing the interpretation of a contract. (*In re Marriage of Thorne & Raccina* (2012) 203 Cal.App.4th 492, 501-502.)  The fundamental goal of contract interpretation is "to give effect to the mutual intention of the parties as it existed at the time of contracting."  (Civ. Code**,** § 1636.)[3]  The "words of a contract are to be understood in their ordinary and popular sense" (*id*., § 1644), and the parties' intent is ascertained from those words alone if it is "clear and explicit, and does not involve an absurdity."  (*Id*., § 1638.)  Courts routinely consult dictionaries to determine the usual and ordinary meaning of a word.  (*Coburn v*. *Sievert* (2005) 133 Cal.App.4th 1483, 1499.)

A "contract is ambiguous [if its terms are] reasonably susceptible to more than one interpretation."  (*Scheenstra v. California Dairies, Inc.* (2013) 213 Cal.App.4th 370, 389 (*Scheenstra*).)  "Extrinsic evidence is admissible to prove a meaning to which the contract is reasonably susceptible."  (*Iqbal v. Ziadeh* (2017) 10 Cal.App.5th 1, 8 (*Iqbal*).)  "The trial court's determination of whether an ambiguity exists is a question of law, subject to independent review on appeal."  (*Wolf v. Superior Court* (2004) 114 Cal.App.4th 1343, 1351 (*Wolf*).)

" 'It is . . . solely a judicial function to interpret a written instrument unless the interpretation turns upon the credibility of extrinsic evidence.' "  (*Tin Tin Corp. v. Pacific Rim Park, LLC* (2009) 170 Cal.App.4th 1220, 1225.)  Therefore, " '[w]hen no extrinsic

---

[3] All statutory references are to the Civil Code unless otherwise indicated.

evidence is introduced, or when the competent extrinsic evidence is not in conflict, the appellate court independently construes the contract. [Citations.]' " (*Iqbal*, *supra*, 10 Cal.App.5th at p. 8.) When conflicting extrinsic evidence has been introduced, requiring credibility determinations by the finder of fact, we apply the substantial evidence standard of review to those determinations. (*Hewlett-Packard Co. v. Oracle Corp.* (2021) 65 Cal.App.5th 506, 531-532.) Put differently, the trial court's resolution of conflicts in the extrinsic evidence are reviewed for substantial evidence. (*Wolf*, *supra*, 114 Cal.App.4th at p. 1351.)

The standard of review applicable to the trial court's application of the contract terms to the facts depends on whether the facts are in dispute. Where the relevant facts are not in dispute, our review is de novo. (*Scheenstra*, *supra*, 213 Cal.App.4th at p. 391.) But where "the facts to which a contract provision must be applied are disputed or require the weighing of evidence, the application of that provision presents a question of fact," and our review is for substantial evidence. (*Id.* at p. 391, fn. 15.)

The parties disagree as to the standard this court should apply in reviewing the trial court's determination that the dividend does not constitute "proceeds" within the meaning of the MSA. Donohoe argues that our review is de novo and asserts that no extrinsic evidence was presented below as to the meaning of the contract term "proceeds." Zaorski maintains the substantial evidence standard of review applies because extrinsic evidence was presented on the meaning of the MSA's terms, including "proceeds."

In fact, the parties do not dispute the meaning of the term "proceeds" on appeal, did not dispute it below, and submitted no extrinsic evidence as to the meaning of that term in the trial court. Donohoe has consistently argued that the term "proceeds" is not ambiguous and should be given its plain meaning. Below, she pointed to dictionary definitions of "proceeds," including "the total amount brought in"; "that which proceeds,

8

is derived, or results from something"; and "that which is obtained or gained by any transaction." In the trial court, Zaorski did not assert that "proceeds" was susceptible to a different interpretation than the one offered by Donohoe; he instead argued that the dividend did not meet the definition of proceeds. On appeal, the parties *agree* that "proceeds" should be given its ordinary meaning and *agree* on the dictionary definition "the total amount brought in."

The parties' dispute centers on the application of that term to the facts. That is, they disagree as to whether the dividend meets their agreed-upon definition of proceeds. The evidence submitted at trial—which addressed the nature of the dividend and its connection, if any, to the sale of Sequoia—was relevant to that dispute. As discussed below, the relevant facts are not in dispute. Accordingly, our review is de novo.

### 2. Analysis

Again, the parties agree that "proceeds," as it is used in the MSA, means "the total amount brought in." For that definition, they rely on Merriam-Webster's Dictionary, which defines "proceeds" as " the total amount brought in."[4] Other dictionary definitions of "proceeds" include "money that a person or organization makes from selling . . . something"[5], "the money or profit derived from a sale, business venture, etc."[6], "the amount of money received from a particular event or activity or when

---

[4] Merriam-Webster's Dict. Online <https://www.merriam-webster.com/dictionary/proceeds> [as of May 9, 2022], archived at: < https://perma.cc/NUH2-EJBD>.)

[5] Macmillan Dict. Online <https://www.macmillandictionary.com/us/dictionary/american/proceeds> [as of May 9, 2022], archived at: <https://perma.cc/E4MK-WP44>.)

[6] Collins Dict. Online <https://www.collinsdictionary.com/us/dictionary/english/proceeds> [as of May 9, 2022], archived at: <https://perma.cc/66P4-A3WR>.)

9

something is sold"[7], and "that which is obtained or gained by any transaction or process; an outcome; esp. the money obtained from an event, activity, or enterprise."[8] Based on these sources, we construe the term "proceeds," as it is used in the MSA, to mean "the total amount of money brought in by a transaction."

Having construed that term, we apply it to the facts. Those facts are not in dispute. It is undisputed that whether Blackboard was going to purchase Sequoia's cash reserves along with its other assets and liabilities was a point of negotiation between Blackboard and Sequoia. It is undisputed that the companies negotiated an agreement by which Blackboard did not purchase that cash and explicitly allowed Sequoia to use the cash to issue a special dividend to shareholders. It is undisputed that the Sequoia board issued such a dividend because of the impending merger to prevent Blackboard from obtaining an asset (the cash) it had not purchased.

What is disputed is whether, under these facts, the dividend constitutes proceeds. That is, was the dividend Zaorski received an amount brought in by the sale of his Sequoia stock? It was not. Under the deal as structured, Blackboard did not buy the cash reserves and those reserves were disbursed to shareholders in the form of the dividend before the deal closed. Certainly, the dividend was tied to the sale. Certainly, the transaction could have been structured differently, with Blackboard paying a higher price to obtain the cash reserves; and under such a deal, the proceeds (and Donohoe's equalizing payment) would have been higher. But, given the structure of the deal here, we cannot say that the dividend was money brought in by the sale. Accordingly, the trial court did not err in ruling that no equalizing payment is due on the cash dividend.

---

[7] Cambridge Dict. Online <https://dictionary.cambridge.org/us/dictionary/english/proceeds> [as of May 9, 2022], archived at: <https://perma.cc/8NYQ-VSJQ>.)

[8] Oxford English Dict. Online <https://www.oed.com/view/Entry/151776> [as of May 9, 2022], archived at: <https://perma.cc/W53L-GNKT>.)

**B.** ***We Construe the Trial Court's Ambiguous Order as Requiring That the Equalizing Payment Be Calculated on Gross (Pre-Tax) Proceeds***

Donohoe argues that the trial court's order is ambiguous as to whether the equalizing payment is to be calculated based on gross (pre-tax) proceeds or net (post-tax) proceeds. She contends that, based on the circumstances surrounding the order's preparation, this court should construe the order as requiring that the equalizing payment be calculated on gross proceeds. Alternatively, Donohoe maintains that, to the extent the trial court ordered that the equalizing payment be calculated based on net proceeds, it erred and the order must be reversed. Zaorski responds that the trial court correctly ordered that the equalizing payment be calculated based on net proceeds and that, regardless, the issue will be moot.

**1.** ***Relevant Background***

In the trial court, Donohoe argued that Zaorski was solely responsible for paying any tax liability incurred in connection with the sale of his Sequoia stock and that she would have no taxable gain as a result of receiving the equalizing payment. Zaorski responded that the equalizing payment should be calculated based on gross proceeds but that his tax basis in the stock would transfer to Donohoe such that she would be liable for the associated taxes.

In December 2018, Judge McGowan announced her ruling in open court. With respect to the tax issue, she stated that while the "parties may not have understood the tax consequences of their agreement, . . . they did, in fact, agree that each would be responsible for the tax consequences for their own assets and so for that reason the Court is not persuaded that the tax basis should be transferred to [Donohoe], but rather [Donohoe] should receive her equalizing payment after the taxes have been paid by the party responsible, in this case [Zaorski], for the sale of those proceeds . . . ." Next, the court reserved jurisdiction on the escrow payment but noted, "it is clear . . . that the equalizing payment [due on any escrow distribution] should reflect a percentage payment

11

to [Donohoe] from [Zaorski] as anticipated and agreed to in the Marital Settlement Agreement in an after tax amount."

Zaorski's counsel prepared a proposed order, which tracked Judge McGowan's language. Specifically, it provided in relevant part: "The Court finds that Petitioner should receive her equalizing payment after the taxes have been paid by the party responsible, in this case Respondent, for the sale of the proceeds. [¶] . . . The equalizing payment on any subsequent [escrow] payments received by Respondent should reflect a percentage payment to Petitioner from Respondent as anticipated and agreed to in the Marital Settlement Agreement in an after tax amount."

Donohoe filed objections, noting that she believed the court had ruled that the equalizing payment should be based on pre-tax proceeds and Zaorski believed the court had ruled that it should be based on post-tax proceeds. Donohoe also filed her own proposed order, which included the following language: "all equalizing payments due [Donohoe] are to be based on [Zaorski's] gross proceeds . . . ."

The trial court adopted the order prepared by Zaorski's counsel, but only after making handwritten edits. Specifically, Judge McGowan added the phrase "but calculated as a percentage of the gross proceeds" twice, where the order addresses the calculation of the equalizing payment. The court's final order states, in relevant part (with interlineations italicized): "The Court finds that [Donohoe] should receive her equalizing payment after the taxes have been paid by the party responsible, in this case [Zaorski], for his disposition of the formerly community stock and stock options, *but calculated as a percentage of the gross proceeds*. [¶] . . . The equalizing payment on any subsequent escrow payments received by [Zaorski] should reflect a percentage payment to [Donohoe] from [Zaorski] as anticipated and agreed to in the Marital Settlement Agreement, in an after tax amount, *but calculated as a percentage of the gross proceeds*."

12

## 2. Legal Principles

"A court order is interpreted under the same rules for interpreting writings in general.  [Citations.]  The language of a writing governs if it is clear and explicit.  But when it is susceptible 'to two interpretations, the court should give the construction that will make the [writing] lawful, operative, definite, reasonable and capable of being carried into effect and avoid an interpretation which will make the [writing] extraordinary, harsh, unjust, inequitable or which would result in absurdity.'  [Citation.]" (*In re Marriage of Falcone & Fyke* (2012) 203 Cal.App.4th 964, 989.)  "If an order is ambiguous, the reviewing court may examine the record for its scope and effect and may look at the circumstances of its making."  (*In re Marriage of Samson* (2011) 197 Cal.App.4th 23, 27; *In re Marriage of Falcone & Fyke*, at p. 989 ["Subsequent actions by the rendering judge may be considered as bearing upon the judgment's intended meaning and effect.  [Citation.]".)

## 3. Analysis

The parties dispute whether the equalizing payment is to be calculated on after-tax or pre-tax proceeds.  The order provides that the equalizing payment is to be made "after the taxes have been paid . . . but calculated as a percentage of the gross proceeds."  It further provides that the portion of the equalizing payment paid on future escrow payments be made "in an after tax amount, but calculated as a percentage of the gross proceeds."  The portion of the order addressing the future escrow payment is internally inconsistent.  Either the payment must be made based on the gross or pre-tax proceeds, or it must be made after taxes based on the net proceeds.  Because the order requires both that the payment be made "in an after tax amount" and be "calculated as a percentage of the gross proceeds," it is ambiguous.[9]

---

[9] Zaorski asserts without explanation that the order unambiguously calls for the equalizing payment to be calculated based on after-tax proceeds.  We cannot agree.

13

Given the order is ambiguous, we look to the circumstances of its making. For the reasons set forth below, those circumstances make clear that the order is properly construed as requiring the equalizing payment to be calculated based on the gross proceeds, with Zaorski bearing the full burden of the tax liability.

First, in announcing her ruling, Judge McGowan squarely rejected Zaorski's position on that tax issue. He had argued that his tax basis should transfer to Donohoe, with her paying the taxes on the gain. Judge McGowan was "not persuaded that the tax basis should be transferred to [Donohoe]." Judge McGowan also identified Zaorski as "the party responsible" for paying the taxes, both orally and in the final written order.

Second, when the parties disagreed as to the language in the written order, Judge McGowan added—consistent with Donohoe's request—that the payment be "calculated as a percentage of the gross proceeds." The addition of that language would have been unnecessary (and, indeed, nonsensical) had the court intended that the payment be calculated based on the net or after-tax proceeds.

Our construction of the order is consistent with the MSA. Paragraph 6 of that agreement states: "each party is . . . solely responsible for any tax ramifications upon the disposition of any property awarded to them under this Stipulated Judgment." The Sequoia stock was awarded to Zaorski by the stipulated judgment. Accordingly, he is "solely responsible for any tax ramifications upon the disposition" of that stock to Blackboard. Zaorski's argument that Donohoe is liable for the taxes on her portion of the proceeds because she "was awarded a portion of the proceeds from the sale of the Sequoia stock" is not compelling. No proceeds existed at the time the MSA was executed. Unsurprisingly then, the agreement did not award Donohoe theoretical future proceeds. Instead, it awarded all of the stock to Zaorski and required him to make a future cash payment to Donohoe under certain circumstances.

14

Zaorski also contends that paragraph 13 of the MSA compels a different conclusion as to the parties' intent regarding the tax liability associated with the sale of his Sequoia stock. He notes that paragraph 13 of the MSA used the word "net" in discussing proceeds.[10] He argues "net" means "net of taxes," such that paragraph 13 requires the equalizing payment to be calculated on after-tax proceeds. While Zaorski did initially assert this argument below, he later abandoned it to argue that the equalizing payment should be calculated based on gross proceeds with his tax basis transferring to Donohoe. Indeed, in his closing argument, he took a position contrary to the one he now makes, asserting that "the tax liability related to the equalizing payment in the parties' MSA is not specifically detailed nor addressed in Paragraph 13."

" 'It is a well-established tenet of appellate jurisprudence that a litigant may not pursue one line of legal argument in the trial court, and having failed in that approach, pursue a different, and indeed, contradictory line of argument on appeal.' [Citation.] ' "Bait and switch on appeal not only subjects the parties to avoidable expense, but also wreaks havoc on a judicial system too burdened to retry cases on theories that could have been raised earlier." [Citation.]' [Citation.]" (*Wall v. California Coastal Com.* (2021) 72 Cal.App.5th 943, 956.) The argument has been forfeited, and we decline to consider it for these reasons.

---

[10] The MSA provided an example of how the calculation might work, stating: "For example, if Sequoia Retail Systems is acquired by a third party, [Zaorski] may receive stock and other cash for his 475,000 shares and 365,430 options that he is confirmed with under this agreement. At that time, the parties' business appraiser must first determine the cumulative value of the stock and cash Respondent receives on the transaction. For the sake of this example, we assume that the *net value* of the stock and cash is $l,600,000.00. If the actuarial value of Petitioner's CalPERS pension at that time were $l,500,000.00, then Respondent's *net stock proceeds* would exceed that value by $100,000. Under the foregoing formula, Respondent would then pay Petitioner $30,000 as an equalizing payment." (Italics added.)

15

Finally, Zaorski argues that this issue—which party bears the burden of the tax liability—will be moot by the time our opinion issues because a trial date has been set on his motion to calculate the equalizing payment. (Although he asserts that the trial will not proceed as scheduled and will be reset.) We disagree.

"A case is considered moot when 'the question addressed was at one time a live issue in the case,' but has been deprived of life 'because of events occurring after the judicial process was initiated.' " (*Wilson & Wilson v. City Council of Redwood City* (2011) 191 Cal.App.4th 1559, 1574.) "The pivotal question in determining if a case is moot is . . . whether the court can grant the plaintiff any effectual relief." (*Ibid.*) If events have made such relief impracticable, rendering the case moot, dismissal is generally appropriate. (*Ibid.*)

Even assuming the trial court has already calculated the equalizing payment, we nevertheless can grant Donohoe effective relief. To the extent the trial court adopted a reading of the February 22, 2019 order that differs from our own, Donohoe can seek relief in the trial court based on our construction.

In sum, we construe the February 22, 2019 order as requiring that the equalizing payment be calculated based on the gross or pre-tax value of each distribution Zaorski receives from Blackboard.

### C. *Postjudgment Interest*

Donohoe maintains that the trial court erred by awarding postjudgment interest accruing as of the date she filed her request for order, arguing the interest should begin accruing on July 16, 2016—30 days after Zaorski accepted the valuation of her pension. For that position, Donohoe relies on the MSA's requirement that Zaorski make the equalizing payment within 30 days "of the valuation of the CalPERS pension." Zaorski agrees that the trial court erred, but argues that Donohoe suffered no prejudice because, in

16

his view, the amount of the equalizing payment remains uncertain such that he owes no interest.

### 1. *Paragraph 13 of the MSA is a Money Judgment*

The MSA was incorporated into the judgment of dissolution. In *In re Marriage of Pollard* (1988) 204 Cal.App.3d 1380, 1382 (*Pollard*), our colleagues in the Fourth District held that "part of a judgment of dissolution which awards money in lieu of an in-kind division of nonmonetary community property is a money judgment on which interest accrues from the date of its entry, in the absence of an express or implied agreement by the parties to the contrary." More recently, the Second District reached a similar result in *In re Marriage of Dalgleish & Selvaggio* (2017) 17 Cal.App.5th 1172, 1177-1180 (*Dalgleish & Selvaggio*), concluding that an equalizing payment in a dissolution judgment is a money judgment. Based on these authorities, we conclude that paragraph 13 of the MSA (which was incorporated into the judgment of dissolution) is a money judgment.

### 2. *When Did Postjudgment Interest Begin to Accrue?*

Generally, "interest commences to accrue on a money judgment on the date of entry of the judgment." (Code Civ. Proc., § 685.020, subd. (a).) But Donohoe does not argue that interest began to accrue when the judgment of dissolution was entered in 2009. Such an argument would be hard to make in this case, given no equalizing payment was then due. Indeed, it was unknown whether such a payment even would be required at that time. Instead, she seeks interest on the portion of the equalizing payment based on the July 2016 distribution from July 16, 2016—30 days after Zaorski accepted the valuation of her pension. Donohoe proposes treating the September 2016 and December 2018 distributions as installment payments and says statutory interest should accrue beginning 30 days after Zaorski received each subsequent distribution.

17

Zaorski makes numerous arguments in response. The thrust of his contentions is that the amount of the equalizing payment was unknown on July 16, 2016, and remains uncertain even today, such that interest has not yet begun to accrue.

### a. *Legal Principles and Standard of Review*

Postjudgment "interest commences to accrue on a money judgment on the date of entry of the judgment." (Code Civ. Proc., § 685.020, subd. (a).) If, however, "a money judgment is payable in installments, interest commences to accrue as to each installment on the date the installment becomes due," "[u]nless the judgment otherwise provides." (*Id.*, subd. (b).) As a "general equitable principle[,] ' "a person *who does not know what sum is owed* cannot be in default for failure to pay." ' " (*Dalgleish & Selvaggio*, *supra*, 17 Cal.App.5th 1172, 1179, fn. 3.)

While we are concerned with postjudgment interest here, the law governing prejudgment interest is useful in analyzing Zaorski's uncertainty argument. (See *Dalgleish & Selvaggio*, *supra*, 17 Cal.App.5th at p. 1181 [considering "the analogous area of prejudgment interest" in addressing argument that postjudgment interest could not accrue until amount of equalization payment was certain].) Section 3287, subdivision (a) provides for prejudgment interest where damages are "certain, or capable of being made certain by calculation." Courts have held that "the certainty required of Civil Code section 3287, subdivision (a), is absent when the amounts due turn on disputed facts, but not when the dispute is confined to the rules governing liability." (*Olson v. Cory* (1983) 35 Cal.3d 390, 402 (*Olson*).)

"[T]he issue of when interest begins to accrue on an amount included in a monetary judgment is a question of law that we review de novo." (*Dalgleish & Selvaggio*, *supra*, 17 Cal.App.5th at pp. 1177-1178.)

18

### b. *Analysis*

The trial court ordered postjudgment interest to begin accruing on April 11, 2017, the date Donohoe filed her request for order. As the parties agree, that was error. No legal basis exists for ordering the accrual of *postjudgment* interest from that date.[11]

The key question here is when—if at all—the amount of the equalizing payment became sufficiently certain to trigger the accrual of postjudgment interest. We begin by addressing the portion of the equalizing payment based on the July 2016 distribution. We then address the portion of the equalizing payment based on subsequent distributions.

*Olson* is instructive. There, each member of the plaintiff class (all judges and judicial pensioners) was due one "of two readily calculable amounts: (1) the salary or pension due under [the applicable statute] as it read before [a] 1976 amendment or (2) that due under the section as amended." (*Olson*, *supra*, 35 Cal.3d at p. 402.) "The question whether to pay any judge or pensioner under one version of the statute or the other did not depend on any factual uncertainty or dispute" but on the resolution of legal issues. (*Ibid*.) Our Supreme Court concluded that "[u]ncertainty over those legal issues did not prevent the amounts due from being 'certain or capable of being made certain by calculation' (Civ. Code, § 3287, subd. (a))." (*Ibid*.) As we shall demonstrate, this case is analogous.

The parties have two primary disputes—whether the dividend constituted proceeds and who bore the tax liability. Neither party claimed below that the tax issue impacted the calculation of the equalizing payment. Instead, they disputed whether Zaorski's tax basis transferred to Donohoe such that she would pay a portion of the taxes after

---

[11] Where a party is entitled to "receive damages based upon a cause of action in contract where the claim was unliquidated," the trial court has the discretion to order *prejudgment* interest to accrue "from a date prior to the entry of judgment . . . , but in no event earlier than the date the action was filed." (§ 3287, subd. (b).) But this case involves postjudgment interest.

19

calculation and payment. Accordingly, the only dispute that impacted the calculation of the equalizing payment was whether the dividend constituted proceeds. And, as discussed above, that question did not depend on any factual dispute but on the resolution of legal issues—namely, the application of the MSA to the undisputed facts. Therefore, once the parties knew the amount of the July 2016 distribution and the value of Donohoe's pension, the initial equalizing payment was one of two readily calculable amounts: (1) 30 percent of the difference between the July 2016 distribution and the value of Donohoe's pension (30% x (distribution - pension)) or (2) 30 percent of the difference between the sum of the July 2016 distribution and the dividend and the value of Donohoe's pension (30% x (distribution + dividend - pension)).

The parties knew the value of Donohoe's pension on June 16, 2016, when Zaorski accepted the appraiser's valuation. The parties knew the amount of the July 2016 distribution no later than July 19, 2016—the day it was paid. The parties knew the amount of the dividend when it was paid in May 2016. Accordingly, the portion of the equalizing payment based on the July 2016 distribution was one of two readily calculable amounts as of July 19, 2016. Postjudgment interest on that portion of the equalizing payment should run from that date.

The portion of the equalizing payment based on the September 2016 distribution was readily calculable on the date that distribution was made—September 8, 2016. Postjudgment interest on that portion of the equalizing payment should run from that date.

The portion of the equalizing payment based on the December 2018 distribution was readily calculable on the date that distribution was made—December 31, 2018. Postjudgment interest on that portion of the equalizing payment should run from that date.

Zaorski attempts to conjure up uncertainty by arguing that because "[n]o business appraiser was ever retained[,] we still don't know the 'cumulative value' [he] received" on the sale. This argument is meritless. Paragraph 13 does call for "a mutually acceptable business appraiser to determine the value of Respondent's disposition or exchange of Sequoia Retail Systems stock shares and options. . . ." But, here, Zaorski received all cash in exchange for his shares. As Zaorski himself asserted in a June 16, 2016 e-mail to Donohoe, a business appraiser is not needed to determine the value of cash.

In sum, the trial court erred in ordering postjudgment interest to begin accruing on April 11, 2017. We shall direct the trial court on remand to order postjudgment interest as follows: on the portion of the equalizing payment based on the July 2016 distribution accruing as of July 19, 2016; on the portion of the equalizing payment based on the September 2016 distribution accruing as of September 8, 2016; on the portion of the equalizing payment based on the December 2018 distribution accruing as of December 31, 2018; and on any portion of the equalizing payment based on any subsequent distribution accruing as of the date of that subsequent distribution.

### D. The Impact of Blackboard's Deduction From Zaorski's Escrow Distribution on the Equalizing Payment

Blackboard deducted nearly $94,000 from Zaorski's December 2018 distribution to reimburse the company for legal fees it incurred responding to discovery propounded by Donohoe in connection with this action. Blackboard did so in reliance on indemnification provisions in the merger agreement. Below, each party argued that, in calculating the equalizing payment based on the December 2018 distribution, the other should bear the full burden of that deduction. Zaorski characterized the legal fees as a post-separation debt incurred by Donohoe (by propounding excessive discovery) and argued that the family court should exercise its equitable powers to assign the debt solely

21

to her. Donohoe, in turn, characterized the legal fees as Zaorski's post-separation debt (incurred under the terms of the merger agreement), for which he was solely liable under the MSA. The trial court declined to shift the full burden to either party, instead ordering them to divide the escrow distribution Zaorski did receive pursuant to the MSA.

On appeal, Donohoe argues this was error. She contends that paragraph 15 of the MSA governs the issue and makes Zaorski solely liable for his post-separation debts, including the amount deducted from his escrow distribution to pay Blackboard's attorney fees. Zaorski responds that the trial court's order was not an abuse of discretion.

We disagree with Donohoe that paragraph 15 of the MSA governs. That provision states, in relevant part: "Each party will be separately liable for the debts, obligations and other liabilities incurred by them after the date of separation. Each party will indemnify and hold the other party harmless for any such separate obligations." Of course each party is separately liable for the debts, obligations, and liabilities they incur *after* the marriage is dissolved and the community ceases to exist. Accordingly, paragraph 15 addresses such liabilities incurred between the date of separation and the date of dissolution. Here, we are concerned with events that took place long after the parties' marriage ended. Paragraph 15 has no application.

The parties' dispute relates to the calculation of the equalizing payment due on the escrow distribution—namely, whether that calculation is made before or after the deduction for Blackboard's legal fees. Therefore, it is paragraph 13 that governs. Under that provision, Donohoe is entitled to 30 percent of Zaorski's "proceeds" from the sale of Sequoia that exceed the value of her pension. Thus, whether she is entitled to a portion of the money Blackboard deducted from Zaorski's December 2018 escrow distribution turns on whether that money constitutes "proceeds" within the meaning of the MSA.

As discussed above, "proceeds," as it is used in the MSA, means the total amount of money brought in by a transaction. Zaorski never received the deducted money.

22

Accordingly, it was not money he *brought in* from the sale of his Sequoia stock and does not constitute "proceeds."

The language in paragraph 13 explaining how the equalizing payment is to be calculated confirms our conclusion that the deducted amount does not constitute "proceeds." That language states: "For example, if Sequoia Retail Systems is acquired by a third party, [Zaorski] may receive stock and other cash for his 475,000 shares and 365,430 options that he is confirmed with under this agreement. At that time, the parties' business appraiser must first determine the cumulative value of the stock and cash Respondent *receives* on the transaction." (Italics added.) Because Zaorski did not *receive* the money Blackboard deducted from his escrow distribution, it did not constitute "proceeds" for purposes of calculating the equalizing payment. Therefore, the trial court did not err in ordering that the equalizing payment be calculated based on the amount Zaorski actually received.

## III.   DISPOSITION

The February 22, 2019 order appealed from in case No. H046846 is reversed. The matter is remanded to the superior court with directions to enter a new and different order that conforms with this opinion. As to the issue of postjudgment interest, the new order shall award Donohoe postjudgment interest as follows: on the portion of the equalizing payment based on the July 2016 distribution accruing as of July 19, 2016; on the portion of the equalizing payment based on the September 2016 distribution accruing as of September 8, 2016; on the portion of the equalizing payment based on the December 2018 distribution accruing as of December 31, 2018; and on any portion of the equalizing payment based on any subsequent distribution accruing as of the date of that subsequent distribution.

The July 19, 2019 order appealed from in case No. H047268 is affirmed.

The parties shall bear their own costs on appeal.

23

_____
ELIA, ACTING P.J.

WE CONCUR:


_____
BAMATTRE-MANOUKIAN, J.



_____
WILSON, J.




*Donohoe v. Zaorski*
H046846
H047286